**Application of SHACKELL.**
**Patent Appeal No. 5854.**

United States Court of Customs and Patent Appeals.

Feb. 18, 1952.

Leon F. Shackell, Chicago, Ill., pro se.

E. L. Reynolds, Washington, D. C. (J. Schimmel, Washington, D. C., of counsel), for Commissioner of Patents.

Before GARRETT, Chief Judge, and JACKSON, O'CONNELL, JOHNSON and WORLEY, Judges.

GARRETT, Chief Judge.

This is an appeal from the decision of the Board of Appeals of the United States Patent Office affirming the rejection by the Primary Examiner of three claims, being all the claims, of appellant's patent application, serial No. 536,054, filed May ·17, 1944, entitled "Germicide."

The claims are numbered 649, 650, and 651 respectively. All three were rejected as being unpatentable over prior art cited, and numbers 649 and 650 on the additional ground that they are unduly broad, indefinite, and functional and do not meet the statutory requirement for particularity in claiming.

First consideration will be given the rejection based on prior art.

Appellant, representing himself, filed, an elaborate brief which covers seventy-five printed pages and constitutes an interesting treatise on the chemical phases of the case. The legal questions at issue are argued in great detail and approximately one hundred court decisions are cited, many of them being quoted from and analyzed. Different text books on chemistry are cited and quotations are made from Robinson on Patents.

As we view the case, it is not necessary to its decision to attempt answers to all the refinements and ramifications of reasoning in which appellant indulges. The subject matter, as is true of almost all chemical cases, is highly technical, but there is nothing particularly abstruse about the issues involved.

The following (page references being deleted as indicated by asterisks) from the "foreword" to appellant's brief gives a clear idea of the composition of matter which appellant claims to be patentable: "Each of the rejected claims * * * is drawn to a substantially water-free germicidal composition that is adapted as such

for direct local application, comprising, in substantially homogeneous physical admixture, a highly caustic phenol and a nitrogenous polar material; the latter being defined by a number of limiting characteristics recited in each claim. The phenol,—typified by carbolic acid * * *,—is the essential germicidal agent, but by itself, or even when in dilute solution in water * * *, is corrosive to tissues when applied directly thereto. The nitrogenous polar material serves to reduce or eliminate the causticity of the phenol without proportionately reducing its germicidal power. In the specification * * *, and occasionally in this brief, the nitrogenous polar material may be referred to as causticity-reducing agent and as phenol-tempering agent. * * *."

The following is quoted from appellant's brief concerning the claims:

"None of the appealed claims is drawn to a composition consisting of an individual compound; instead, each claim is for a product—that is, for a composition made up of certain distinct ingredients. * * *

"Claim 649, the broadest of the appealed claims, is drawn generically to the use of a nitrogenous polar material * * * possessing characteristics which also are recited in that claim.

"Claim 650 is a generic claim, but narrower in scope than claim 649 in that the nitrogenous polar material is limited to an amide. * * *

"Claim 651 is a specific claim; the nitrogenous polar material being limited therein * * * to the single compound acetanilid, which is the second one of the amides disclosed in Example 5. * * *."

The claims read as follows:

"649. A substantially water-free, phenolic, germicidal composition that is adapted as such for direct local application, said composition comprising a highly caustic phenol in substantially homogeneous physical admixture with a · nitrogenous polar material that is preponderantly anionoid in molecular structure and further characterized (a) by being chemically compatible with the caustic phenol, and (b) by being capable of forming a substantially homogeneous physical system with more than its weight of the caustic phenol; said physical system, when so formed and when applied to a substantially dry cutaneous surface, exhibiting a delay in the time of onset of caustic effect of the phenol of at least 100 per cent beyond the time of onset of caustic effect of a control mixture containing the same phenol in the same proportion by weight as in said physical system, but with said nitrogenous polar material being substituted in the control mixture by a substantially nonpolar hydrocarbon of the class consisting of cyclohexane, pinene, p-xylene and a mixture of isomeric xylenes; said composition, upon standing in a closed container at room temperature, remaining substantially free from segregation therein of ingredients thereof; said composition containing the caustic phenol in an effective germicidal concentration; and said nitrogenous polar material being present in the composition in an amount sufficient to reduce the causticity of the phenol without proportionately reducing its germicidal power.

"650. A substantially water-free, phenolic, germicidal composition that is adapted as such for direct local application, said composition comprising a highly caustic phenol in substantially homogeneous physical admixture with a nitrogenous polar material in the form of an amide that is preponderantly anionoid in molecular structure and further characterized (a) by being chemically compatible with the caustic phenol, and (b) by being capable of forming a substantially homogeneous physical system with more than its weight of the caustic phenol; said physical system, when so formed and when applied to a substantially dry cutaneous surface, exhibiting a delay in the time of onset of caustic effect of the phenol of at least 100 per cent beyond the time of onset of caustic effect of a control mixture containing the same phenol in the same proportion by weight as in said physical system, but with the amide being substituted in the control mixture by a substantially nonpolar hydrocarbon of the class consisting of cyclohexane, pinene, p-xylene, and a mixture of isomeric xylenes; said composition, upon standing in a closed

container at room temperature, remaining substantially free from segregation therein of ingredients thereof; said composition containing the caustic phenol in an effective germicidal concentration; and said amide being present in the composition in an amount sufficient to reduce the causticity of the phenol without proportionately reducing its germicidal power.

"651. A substantially water-free, phenolic, germicidal composition that is adapted as such for direct local application, said composition comprising a highly caustic phenol in substantially homogeneous physical admixture with a nitrogenous polar material in the form of acetanilid that is preponderantly anionoid in molecular structure and further characterized (a) by being chemically compatible with the caustic phenol, and (b) by being capable of forming a substantially homogeneous physical system with more than its weight of the caustic phenol; said physical system, when so formed and applied to a substantially dry cutaneous surface, exhibiting a delay in the time of onset of caustic effect of the phenol of at least 100 per cent beyond the time of onset of caustic effect of a control mixture containing the same phenol in the same proportion by weight as in said physical system, but with the acetanilid being substituted in the control mixture by a substantially nonpolar hydrocarbon of the class consisting of cyclohexane, pinene, p-xylene, and a mixture of isomeric xylenes; said composition, upon standing in a closed container at room temperature, remaining substantially free from segregation therein of ingredients thereof; said composition containing the caustic phenol in an effective germicidal concentration; and said acetanilid being present in the composition in an amount sufficient to reduce the causticity of the phenol without proportionately reducing its germicidal power."

Appellant's brief states the grounds of rejection in the following: "The Patent Office tribunals have rejected each of the appealed claims for anticipation by each of two non-patent publications * * * and have rejected generic claims 649 and 650 as too broad, indefinite and functional and as not properly defining the invention to which each of the latter claims is drawn. * *."

It appears that both the Primary Examiner and the Board of Appeals in fact listed four references as follows: Wood-LaWall, Dispensatory of U. S. of America, Phila., J. P. Lippincott, 22nd Ed., page 8, Gilman, Organic Chemistry—An Advanced Treatise, Vol. 11, pages 1859–1860 (cited by applicant); Backoff 2,347,983 May 2, 1944; Hrynakowski et al. Roczniki Chemii, Vol. 18 (1938) pages 538–541.

However, the Gilman article was mentioned only by the examiner and his allusion to it was made in connection with the rejection for alleged indefiniteness, breadth and functionalism.[1] The Backoff patent was mentioned also by the Primary Examiner, but it was not relied upon by either him or the board.

So, as to the rejection based on prior art, or "old composition" as the Primary Examiner expressed it, just two references are cited—the Wood-LaWall and the Hrynakowski published articles. The latter is understood to have been published in Poland in 1938. A translation of the portion cited as a reference appears in the record. The former appears to have been published in 1937. So, both publications antedated appellant's filing date by six or more years.

As we view the case, the heart of appellant's alleged invention is set forth in the phraseology, "said composition comprising a highly caustic phenol in substantially homogeneous physical admixture with a nitrogenous polar material [acetanilid being specified as the material in claim 651] that is preponderantly anionoid in molecular structure."

This view is in harmony with the following taken from appellant's brief: "Appellant's inventive concept is that of a water-free, germicidal composition, comprising a

---

1. It is noted that appellant quotes from Gilman's Organic Chemistry—An Advanced Treatise—excerpts "having to do with the application of electronic theory to organic chemistry," and he states that he bases his use of the terms "anionoid" and "cationoid" in the application upon the Lapworth-Robinson classification as set forth in Table XV of the Gilman text.

homogeneous physical mixture of a highly caustic phenol and a chemically compatible polar material; the molecular polarization of the latter, in contrast with that of an otherwise suitable nonpolar hydrocarbon, being such that, when admixed with an equal or greater weight of the phenol, the polar material reduces the causticity of the phenol without proportionately reducing its germicidal power, so that the composition is adapted for direct local application to the skin even when its phenol content is upwards of 50 per cent by weight."

The nitrogenous polar material is mixed with the caustic phenol, such as carbolic acid, for the purpose of tempering the phenol with respect to its "burning" or "cauterizing" effect upon the skin, and it must be "present in the composition in an amount sufficient to reduce the causticity of the phenol without proportionately reducing its germicidal power." It must be "chemically compatible with the caustic phenol," by which, we suppose, is meant something which readily will be absorbed into, or at least readily compounded with, the phenol. It also is required that the nitrogenous polar material be capable of forming a substantially "homogeneous physical system" with more than its weight of the caustic phenol —that is, as we understand it, the nitrogenous polar material must be a substance which will work properly when the amount of phenol with which it is mixed weighs more than the polar material weighs.

This is followed by a clause which, at least to a layman, seems somewhat awkwardly phrased. Apparently, it means that the composition defined forms a "physical system" which results in delaying "the time of onset of [the] caustic effect" of the phenol when the composition is applied to the skin, this delay being at least 100 per cent "beyond the time" of onset of the caustic effect when, instead of a nitrogenous *polar* material such, for example, as acetanilid, a substantially *nonpolar* hydrocarbon of the class described (cyclohexane, pinene, etc.) is used to temper the phenol. We suppose it means that the caustic effect of carbolic acid or other phenol in appellant's mixture is not felt so

quickly as it is when the tempering agent is a nonpolar hydrocarbon.

However, whatever its meaning, it is a mere statement of a result and does not affect the patentability of the claims.

There is also a statement in each of the claims to the effect that the composition at issue remains substantially free from segregation of its ingredients when standing in a closed container at room temperature. This too states a result.

The last two clauses relate to the necessity of having the requisite amounts of phenol and nitrogenous polar material— an obvious requirement which does not constitute a patentable limitation.

Appellant's brief states: "The highly caustic phenols, which are primarily material to the issue of anticipation here presented, are carbolic acid and the three isomeric cresols,—namely, orthocresol (o-cresol), metacresol (m-cresol) and paracresol (p-cresol). * * * When pure, each of these phenols, with the exception of metacresol, is a crystalline solid at ordinary room temperature (20° C., or 68° F.); but each melts at a temperature below 45° C. (113° F.) A liquid mixture of the three cresol isomers is commonly called tricresol. * * * The generic or class name 'phenol' is also the ordinary chemical name for carbolic acid. In this brief, therefore, the specific chemical compound phenol ordinarily will be designated as carbolic acid."

All four of the foregoing phenols are named in appellant's specification and he therein recites also a series of experiments which he conducted with phenol-tempering agents and the results of his experiments in finding what are claimed to be nitrogenous polar materials, meeting the requirements of the counts, are summarized in his brief as follows (page references to the record being deleted): "With very few exceptions * * *, the polar material in each of the aforementioned 240 odd tested compositions was a single member of a group totalling about 196 distinct nitrogenous compounds. These compounds, a large majority of which also contain the element oxygen, are distributed among ex-

amples in the specification substantially as follows: 21 amides in Example 5 * * *, —not including 2 amides disclosed in Example 12 * * *; 13 nitrogenous esters in Example *6a* * * *; 80 acidulated amines in Example *6b* * * *; 50 acidulated alcoholamines in Example *6c* * *: 12 nitriles in Example 10 * * *; 7 compounds in Example 11 * * *; 10 compounds in Example 12 * * *; and 3 compounds in Example 13 * * *. *Each of the foregoing nitrogenous compounds comes within the scope of one or more of appealed claims 649, 650 and 651."* (Italics in last sentence supplied.)

In his official statement following the appeal to the board the Primary Examiner wrote as follows on the question of anticipation:

"The phenols are among the most widely used chemicals both pharmaceutically and generally. The mixtures of phenols with various other chemicals have been exhaustively investigated. Hrynakowski is a report of such an investigation. The reference shows phase diagrams giving the freezing points of various mixtures of phenols with acetanilid and acetamide. It is considered that the reference is a fair disclosure of the two ingredients in applicant's proportions. The area above the curve is homogeneous and liquid. The curve shows mixtures which lie above the curve at room temperatures. * * *. The applicant in Example 17 disclosed as a specific example the mixture of 9 parts of phenol to 1 of acetamide. These proportions were actually prepared in the reference.

"The Wood-LaWall reference shows that mixtures of phenols with acetanilid form mixtures which liquefy. Applicant's claim is limited to homogeneous. It is conceded that whether or not the mixture is homogeneous depends upon the relative proportions, but the eutectic ['easily melting'] proportions are homogeneous above and below the melting point."

In the course of its decision approving that of the Primary Examiner the board said:

"The Wood-LaWall reference, being the 22nd Edition of the United States Dis-

pensatory, states that eutectic mixtures which liquefy are formed when acetanilid is triturated with phenol, thymol or resorcinol. It will be obvious that when such an eutectic mixture of acetanilid and phenol is produced, it will provide an anticipation of claim 651 which is the most specific of the claims on appeal. Appellant asserts that this reference does not disclose the ratio required to produce the eutectic mixture. However, *the claims on appeal are not restricted as to ratios.* The Hrynakowski et al reference describes physical mixtures of various phenolic compounds including the three cresols with certain nitrogenous polar materials including acetanilid. The graphs on page 541 show that eutectic mixtures of very low melting point are obtained by mixing the cresol with acetanilid, the cresol constituting about 25 per cent of the mixture. Each of these eutectic mixtures provides an anticipation of the composition of claim 651. Since claims 649 and 650 are broader than, but inclusive of, the subject matter of claim 651, it is apparent that each of the two references discussed above likewise provides an anticipation of the compositions of these claims. (Italics supplied.)

"Appellant asserts that the references are insufficient to anticipate the claims because they fail to describe the compositions as suitable germicides, wherein the causticity of the phenol has been reduced. There is no suggestion in the references that the compositions therein disclosed are suitable as germicides. The difficulty with this contention is that the compositions included within the terms of the claims are old and to be patentable the subject matter of the claims must be novel."

Appellant's brief devotes several pages to a discussion of the Hrynakowski and Wood-LaWall articles in disparagement of their value as references, but *it is specifically conceded* that 6 out of 30, or 20 per cent, of Hrynakowski's mixtures used in his experiments "were homogeneous and liquid at room temperature, and so *would come within the terms of appellant's claims."* (Italics supplied.)

Respecting this concession appellant's comment is:

"* * * Hrynakowski, however, gives no indication whatever that any one or all of his few mixtures, which were homogeneous at room temperature, had any significance for him different from that of the rest of his mixtures,—namely, as experimental materials for freezing-point determinations. It certainly was no part of Hrynakowski's problem, for example, to make up a homogeneous mixture of a caustic phenol with acetamide or acetanilid which would remain free from segregation of its ingredients upon standing in a closed container at room temperature * * *; or which would be an effective germicide with little or no caustic action. Hrynakowski in short, was concerned only with studying the operation of natural laws in connection with a series of binary mixtures."

Appellant's brief quotes from the Wood-LaWall reference the statement to the effect that when acetanilid is triturated with phenol, thymol, resorcinol, chloral hydrate, and many other organic drugs, it forms a eutectic mixture which liquefies, and comments as follows: "In view of the foregoing discussion of eutectic mixtures, it is evident that the term 'a eutectic mixture' is used in Wood-LaWall not only loosely, but inaccurately; for there is not only no suggestion in the reference as to the specific proportions of acetanilid and phenol which, when triturated together, will form the eutectic mixture thereof, but there is no suggestion as to the relative amount of acetanilid to be triturated with any one of the specific compounds named in the reference."

We may divert from the rejection based upon prior art long enough to direct attention to the fact that this brings forward a ground of indefiniteness similar to that alleged against appellant's claims in the second ground of rejection.

The brief says further: "It would require * * * extensive experimentation in order to determine the precise proportions of acetanilid and carbolic acid needed to form the eutectic mixture thereof. For this reason, as well as others to be discussed hereinafter in the Argument, appellant

contends that the Wood-LaWall reference does not constitute a valid anticipation of his claims."

It is noted that the Primary Examiner expressed substantially the same thought with respect to appellant's claims 649 and 650 in his discussion of the second ground of rejection to which we hereinafter again refer.

In appealing to us appellant assigned error in thirty-one reasons of appeal. Allegations of error 1–10, 17–20, and 23–25 relate to the question of anticipation—the first ground of rejection. Allegations 11–16, 21, 22, and 26–31 relate to the question of indefiniteness, breadth, and functionalism—the second ground of rejection. In his brief appellant has arranged his argument in numbered paragraphs and lettered sub-paragraphs in a methodical manner and has cited court decisions in connection with each paragraph and sub-paragraph.

The citations are made, of course, upon the supposition or theory that the decisions support appellant's contentions and reasoning. Unhappily for appellant, this theory cannot be sustained. The applicable law is dependent on the facts, and the facts which are conceded by appellant render practically all of the many authorities which he cites irrelevant to his case.

The right to obtain a patent in the United States is predicated upon a provision in the Constitution which reads: "The Congress shall have Power * * * To promote the Progress of Science and useful Arts, by securing for limited Times to * * * Inventors the exclusive Right to their * * * Discoveries". Art. 1, § 8.

This is not a self-executing provision. Action by the Congress was requisite and the First Congress acted in 1790. Sec. 1,. 1 Stat. 109, Act of April 10, 1790.

The original act has been amended frequently and now there is embodied in 35 U. S.C.A. § 31; R.S. 4886 the following phraseology pertinent to the instant case: "Any person who has invented or discovered any new * * * composition of matter, or any new and useful improvements thereof * * * not known or used by others in

this country, before his invention or discovery thereof, and *not * * * described in any printed publication in this or any foreign country*, before his invention or discovery thereof * * * may * * obtain a patent therefor." (Italics supplied.)

Appellant developed a composition which he alleges is new and useful.

We assume it to have been an inventive act—that is, an act which required the exercise of the inventive faculty,—but when he made application for a patent the researchers in the Patent Office, in the performance of duties established by Congress, found that a composition such as his had been described in printed publications in this country and in a foreign country—Poland—at least six years before his application was filed, and he has made no effort, so far as the record shows, to establish that his inventive act took place prior to the issuance of such publication.

Appellant's good faith is not questioned in the slightest. It may be assumed that he personally never saw or heard of the published articles, and that his many experiments conducted with many kinds of materials in his research for "nitrogenous polar materials, predominantly anionoid in molecular structure," and possessing the characteristics described in his claims, were entirely original so far as he was concerned, but that does not alter the plain and unambiguous language of the statute which, in effect, inhibits the granting of a patent for a composition which has been described in printed publications before the invention or discovery was made by the patent applicant.

Appellant urges that "a claimed invention is not anticipated by a prior publication if the latter does not disclose substantially the same invention as having been known *or* used previously by others." (Italics supplied.)

■ The statute does not require both knowledge *and* use. "Known" and "used" are in the alternative in the statute. Obviously, if the composition described in the publication "would come within the terms of appellant's claims" as he concedes in his

brief the Hrynakowski composition would, it must be "substantially the same invention."

Appellant urges that a composition of matter may be intrinsically old in the sense that somebody had previously made the same composition; and yet it will be new in the sense of section 4886, R.S., unless it previously has been made accessible to the public as a perfected invention—either by use, *by publication*, or by patent." (Italics supplied.)

Without agreeing to the correctness of all the implications involved in this contention, we may point out that the composition was made accessible to the public by publication.

Another contention is to the effect that neither of the references "discloses any inventive concept—much less the concept embodied in each of the appealed claims," and that this "negates a reduction to practice of each of the compositions disclosed therein."

■ The references disclose the composition, and it is immaterial whether it resulted from an inventive concept, an accidental discovery, or merely from skill in the art. The publications indicate that the results named therein were arrived at by experimentation. Appellant made his discoveries by experimentation. When the discoveries were described in the publications the terms of the statute became applicable and the fact, as stated in another part of appellant's brief, that "neither publication discloses or even suggests any tests for demonstrating the utility [i. e., reduction to practice] of a single one of said compositions in practical affairs" is not material. If appellant's composition has utility, the same compositions, as described in the references, must have utility. This is not an interference proceeding involving questions relating to priority.

Appellant presents the contention as to lack of any showing in the references of utility and dwells upon the matter of reduction to practice in a number of sub-paragraphs. Reiteration of the same thought in various forms of phraseology adds no

728

strength to a contention, and it is unnecessary for us to follow and respond to all the sub-paragraphs seriatim.

Appellant's brief asserts that each of the publications relied on "furnishes nothing more than a starting point for further experiments and research," and in another sub-paragraph alleges that "The record is devoid of any showing that the Hrynakowski and Wood-LaWall publications amount to anything more than accounts of abandoned experiments."

This indicates that appellant regards a publication as being somewhat akin to a patent application. The researchers in the references did not seek patents. They gave the public what they discovered as a result of experiments. The results they obtained meet appellant's claims. To the extent that they donated their discoveries to the public and sought no patents on them, they may be said to have abandoned them, but that is not a kind of abandonment which inures to appellant's benefit. It was an abandonment to the public. The public became the possessor of the discoveries with freedom to use or not use such discoveries as it (the public) elected.

■ It surely is settled definitely, as a principle of patent law, that a new use for an old composition does not render claims for such use patentable. In re Thuau, 135 F.2d 344, 30 C.C.P.A., Patents, 979, and the several cases therein cited.

Appellant, however, insists here, in substance, that the researchers did not recite in the references nor disclose any use of the composition which they developed and that he discovered a use for the composition which he developed. He, therefore, urges that this case is distinguishable from the Thuau case, supra, and like cases.

■■ We are unable to agree that there is any patentable distinction between discovering a use and discovering a *new* use for a chemical product developed by experimentation. The patent which appellant seeks is for a composition of matter *as a composition*; not for the concept of using the composition. See In re Haller, 161 F.2d 280, 34 C.C.P.A., Patents, 1003. In the case of In re Crosley, 159 F.2d 735,

736, 34 C.C.P.A., Patents, 882, we declared, "this court is committed to the doctrine that where a product is clearly disclosed in a publication, * * * the disclosure of the composition is sufficient to anticipate a claim therefor", citing In re Marden, 48 F.2d 428, 18 C.C.P.A., Patents, 1119; and In re Von Bramer, 127 F.2d 149, 29 C.C.P.A., Patents, 1018, 1024. Another case, the reasoning in which we regard as quite pertinent here, is that of In re Stoll, 161 F.2d 241, 34 C.C.P.A., Patents, 1058.

The brief of the Solicitor for the Patent Office before us in the instant case, after stating that the holding in the Thuau case, supra, was not a new doctrine, as this court pointed out in the case of In re Benner, 174 F.2d 938, 36 C.C.P.A., Patents, 1081, referred to the case of Old Town Ribbon and Carbon Co., Inc., v. Columbia Ribbon and Carbon Mfg. Co., Inc., 159 F.2d 379, 382, wherein Judge Learned Hand speaking for the United States Circuit Court of Appeals, Second Circuit, used the following language, deemed by the solicitor to be apposite the Thuau doctrine: " * * * since 1793, unless a patent disclosed a 'new and useful art,' a new 'machine,' a new 'manufacture,' or a new 'composition of matter,' it has not been a valid patent. If it be merely for a new employment of some 'machine, manufacture or composition of matter' already known, it makes not the slightest difference how beneficial to the public the new function may be, how long a search it may end, how many may have shared that search, or how high a reach of imaginative ingenuity the solution may have demanded. All the mental factors which determine invention may have been present to the highest degree, but it will not be patentable because it will not be within the terms of the statute. This is the doctrine that a 'new use' can never be patentable."

■ In view of our conclusion that the rejection of all the claims upon the basis of prior art must be affirmed, we refrain from any further reference to the rejection of claims 649 and 650 as not properly defining the alleged invention.

For the reasons stated the decision of the Board of Appeals is affirmed.

Affirmed.