The **ANDERSON COMPANY**, and Productive Inventions, Inc., Plaintiffs,

v.

**TRICO PRODUCTS CORPORATION,** Defendant.

**Civ. A. No. 5677.**

United States District Court
W. D. New York.

Jan. 17, 1958.

Moot, Sprague, Marcy & Gulick, Buffalo, N. Y., Schroeder, Hofgren, Brady & Wegner, Chicago, Ill. (David L. Landy, Buffalo, N. Y., of counsel, Bernard A. Schroeder, James C. Wood, Lloyd W. Mason, Chicago, Ill., of counsel), for plaintiffs.

Raichle & Tucker, Buffalo, N. Y. (Frank G. Raichle, Arnold Weiss, Buffalo, N. Y., of counsel), Bean, Brooks, Buckley & Bean, Buffalo, N. Y. (Edwin T. Bean, Sr., Buffalo, N. Y., of counsel), The Firm of Casper W. Ooms, Chicago, Ill. (Casper W. Ooms, Chicago, Ill., of counsel), Dos T. Hatfield, Washington, D. C., for defendant.

MORGAN, District Judge.

This is a suit for infringement of United States Letters Patent No. 2,596,063 granted May 6, 1952 to John W. Anderson of Gary, Indiana. This patent was subsequently assigned to Productive Inventions, Inc., an Indiana corporation, and suit is here brought by The Anderson Company of Gary, and Productive Inventions, Inc., both of which are substantially owned and controlled by John W. Anderson.

The original complaint was filed March 26, 1953, since which time innumerable pleadings and proceedings have been had in this court. Without reviewing all of them, it is important to know at the outset that by order filed in the Office of the Clerk of the Western District of New York, October 21, 1954, the late John

Knight, then Chief Judge of the Western District of New York, granted a motion for summary judgment against Productive Inventions, Inc.; hence future reference in this opinion will be solely to the Anderson Company, as plaintiff.

The defendant is a New York corporation, doing business in Buffalo, New York. The jurisdiction of this court arises under the patent laws of the United States.

Plaintiff seeks a determination by this court that its patent has been infringed by defendant by certain devices manufactured and sold by defendant. Defendant seeks by way of counterclaim, a determination that plaintiff's patent is invalid for several reasons, but principally on the grounds that it embodies no inventive concept, that it is indefinite, that John Anderson is not the true inventor and that plaintiff is without clean hands.

The patent in suit is entitled "Windshield Wiper Blade Linkage Assembly" and the device shown and claimed therein is one for the wiping of a curved windshield. The patent has a rather complicated history, almost seven years having elapsed between the filing date and the patent date. A reading of the file wrapper of the patent in suit discloses the following general sequence of events: On December 13, 1945, plaintiff filed with the Patent Office patent application No. 634,729 and an "improvement" patent application No. 634,730. On October 10, 1957, the Patent Office rejected 23 claims, including 1, 2 and 3 of 634,730. Following this, a Patent Office examiner suggested 6 counts for a proposed interference proceeding between 634,730 and Scinta-Rappl application No. 736,492. Plaintiff adopted 5 of the 6 counts, which were then rejected in toto by the examiner, who suggested a single count as a basis for the interference proceeding. Plaintiff adopted this count, which subsequently became claim 6 of the patent in suit, and is one of the claims here in issue.

Following this, the examiner refused to declare an interference between the Scinta-Rappl application, which thereafter issued as Patent No. 2,543,383 and Anderson 634,730. The examiner likewise rejected Scinta-sole application No. 636,548 as a party to an interference proceeding. During the following interference proceeding, the examiner refused to broaden the interference claim and then awarded priority to Anderson 634,-730. On appeal to the Board of Interference Examiners of the Patent Office, and to the United States Court of Customs and Patent Appeals, it was held that the refusal of the examiner to allow substitution of Scinta-sole was not reviewable, but that the decision of the examiner that the Anderson disclosure supported the requirement in the interference claim of an elongated flexible backing strip was not error as a matter of law. Scinta v. Anderson, 193 F.2d 1020, 39 C.C.P.A., Patents, 790. That finding is not binding on this court in this action.

Subsequently, the Patent Office approved claims 1 to 5 of 634,730, all of which had originally been suggested by the examiner as a basis for the interference proceeding and then rejected by him. The Patent Office approved claim 6, the interference count, and claim 7, which had earlier been held unpatentable by the examiner. The Patent Office also approved claims 8 to 17, which had been added by Anderson after 634,730 had been awarded priority, and claims 18 to 31, all reading on a single yoke structure, which were transferred by Anderson from his 634,729 application after the priority award. In May 1952, the patent issued as now constituted.

Plaintiff initiated this action by standing on all of the claims of the patent in suit. However, during the course of trial, plaintiff elected to base its cause on only claims 6, 8, 15 and 17 of the patent. Plaintiff therefore must prevail on these claims or not at all.

After institution of the action, and lengthy pretrial procedure, trial was commenced during June, 1956. It continued for some 25 to 30 trial days, during which time a score or more witnesses were heard, several hundred exhibits intro-

duced, and several thousand pages of trial record produced.

Briefs were submitted during December, 1956 and reply briefs were submitted during February, 1957. After several motions and cross-motions, the parties finally came to agreement on the corrected trial transcript to be submitted to the court during the late fall of 1957. At this point, the court was able to commence its consideration of the case.

The first matter to be considered is defendant's attack upon the validity of the patent in suit on the basis of the prior art.

### Prior Art I

Defendant attacks the validity of the patent in suit, asserting first as a basis for such, developments by Trico prior to 1945. Defendant particularly relies upon Scinta-Rappl patent No. 2,543,383 and the Scinta-sole development (Exhibit D–41).

Defendant first argues that Scinta-Rappl and Scinta-sole completely anticipate Anderson application No. 634,729. Even if the court agreed with defendant that plaintiff's 634,729 blade is unpatentable in view of Scinta-sole and Scinta-Rappl 2,543,383, Anderson's 634,729 never went beyond the application state, and several of its claims were later transfered to the patent in suit. There they are to be found in claims 18 through 31 inclusive. Plaintiff, however, rests its case on claims 6, 8, 15, and 17 of the patent in suit, and on these claims only. Therefore, neither the claims under Anderson 634,729, nor claims 18 through 31 of the patent in suit, are at issue between the parties, and the court will make no specific determination with respect to them.

Scinta-Rappl is a single-yoked structure attached to a flexible backing strip enclosed by the rubber wiping element. The yoke is attached to the bare metal extension of the backing strip in a manner allowing sliding contact between the two members, a so-called "lost motion" joint. Scinta-Rappl also calls for a precurved leaf-spring flexible backing strip entirely enclosed in the rubber wiping element, and attached to the wiper arm at the center of the blade.

Clearly, neither version of Scinta-Rappl contains the triple-yoke pressure-distributing mechanism which is so fundamentally a part of the Anderson device. They, therefore, cannot be considered to read on the patent in suit.

The Scinta-sole device has never been patented and, along with Scinta-Rappl, has never been put into commercial use. Plaintiff asserts that Scinta-sole was never reduced to practice, and cites several cases laying down a general approach to what constitutes adequate reduction. However, it appears from the record that Scinta-sole was reduced to practice to the extent that it was possible to do so in 1944–1945, since no automobiles were then being manufactured with curved windshields. Thus Scinta-sole could reasonably be expected to be reduced to practice only in a laboratory on a curved glass, or else on a car with flat glass. Scinta-sole has a leaf-spring flexible backing strip entirely enclosed in a hollow wiping element. It has a single yoke which is attached to the rubber covering the backing strip by two movable devices which clamp around the rubber covering. Defendant prefers to call these devices "secondary yokes", pointing out that the Patent Office has so defined them. It should also be recalled that a Patent Office examiner, in a decision affirmed by the Commissioner of Patents, has ruled that claim 6 of the patent in suit could not be read on Scinta-sole. Scinta-sole is in no manner a triple-yoke structure in the sense of the patent in suit. Its so-called secondary yokes are simply extensions of the ends of the yoke, clamping the yoke to the backing strip at a single point adjacent each end of the yoke, rather than being true secondary yokes attached to the backing strip at three or more longitudinally spaced points. The devices apply yoke pressure directly to the backing strip, rather than dividing and applying it. Scinta-sole further lacks the sliding metal to metal connection between the

yoke(s) and the backing strip found in the patent in suit. Scinta-sole cannot be considered as anticipating the patent in suit.

## Prior Art II

The bulk of the prior art cited by defendant in an attempt to prove the invalidity of the patent in suit is to be found in 16 specific patents relied upon by defendant. This grouping does not include Scinta-sole, Scinta-Rappl or Zaiger triple-yoke devices, which are considered elsewhere in this opinion. Of this group of 16, 6 were cited by the Patent Office as prior art references in granting the patent in suit. Of the group of 16 patents, 11 are United States patents, 5 are foreign patents.

This court does not intend to fully discuss each patent cited, but it will go into the detail only of those patents which appear to raise a particularly pertinent question of prior art. First, considering the U. S. patents, it is the finding of this court that the following patents obviously do not read on the patent in suit: Pederson – 1,463,590; Stadeker – 1,510,509; Smith – 1,825,891; Anderson – 1,853,-715; Zaiger – 2,149,037; Zaiger – 2,276,-556. All of the foregoing devices are rigid backed blades which are clearly not suited to wiping a curved glass. At best, they simply disclose that such elements found in the patent in suit as a yoked pressure distributing member, a sliding metal "yoke-to-backing strip" connection, and others, are old in the art. There is no denying that some of the components of the patent in suit are old in the art. But it is not clear that the same may be said of the Anderson combination of components.

Horton – 2,167,207; Zierer – 2,254,343; Klingler – 2,537,411 and Horton – 2,659,-097 are all devices having rigid backing strips, but which, at the same time, have wiping elements which would be flexible toward and away from a windshield and thus could be employed in wiping a curved glass. Horton and Morton are both spring-loaded devices. Horton has a tubular backing strip enclosing a spring, forcing movable ends of the back-ing strip away from each other. The rubber wiping element is suspended between the two ends and is thus flexible toward, and away from the surface of a glass which it is wiping. Morton is somewhat similar, but it has a spring enclosed in the rubber wiping element, running the length of that element, with the whole suspended between the ends of a semi-rigid yoke attached to the wiper arm. As ingenious as these devices may be, they do not read upon the patent in suit. Zierer – 2,254,343 and Klingler – 2,537,411 are similar devices which employ a movable cam within a rigid yoke which acts to force toward and away from a windshield a flexible blade suspended between the ends of the rigid back. Both devices contain what could be called a flexible backing strip attached to the blade, and Klingler discloses an extremely rudimentary triple-yoke structure. Both are suitable for wiping a curved glass. Again, however, those devices simply disclose that certain elements of the patent in suit are old in the art, but they obviously do not read on the patent in suit.

Morton – 2,303,694 and Larson – Canadian patent 345,867 are similar devices. Both have a rubber wiping element with a rigid backing strip that is constructed in two halves. Each rigid half is attached at its center to a yoke attached to the wiping arm. The attachment to the yoke is movable, allowing each rigid half to move toward and away from a windshield, but, at the same time, each rigid half is restrained by the continuous rubber wiping element passing through both of them. Defendant, of course, refers to Horton and Larson as triple-structures, and in a sense they are. But not in the sense of the patent in suit. The so-called secondary yokes are firmly clamped to the entire length of the wiping element to which they attach. There is no flexible backing strip present, and the so-called secondary yokes are not attached at three or more longitudinally spaced points. Furthermore, the yokes are not slidably engaged either with each other or to the wiping element. Horton and Larson bear

only a crude resemblance to the patent in suit, and cannot be construed to read on it. In addition to Larson, four other foreign patents are cited by defendant. All of these patents are suitable for wiping curved glass. Three of them, Vauxhall – British Patent No. 427,383; Lucas – British Patent No. 433,467 and Bignon – French Patent No. 820,156 are similar in that they disclose spring-loaded devices roughly similar to the Morton U. S. patent. They all call for a rubber wiping element containing either a flat, crimped or helically coiled spring, the ends of which are attached to a rigid or semi-rigid yoke, thus permitting the rubber to flex toward or away from a windshield.

Vauxhall is composed of a pre-curved rubber element containing a flat spring. There are four yoke-like devices clamped to the back of the rubber, each of which is movably rivited to a curved rigid yoke. Vauxhall obviously reads on the patent in suit only to the extent that it is also a device for wiping a curved glass.

Lucas discloses three forms of suspending a flexible rubber. The first is to suspend the rubber between the ends of a flexible spring-like yoke. The second suspends the rubber between the end of a rigid yoke and a spring attached to the wiper arm at the point where the latter attaches to the wiper motor drive shaft. The third form discloses a spring-loaded rubber suspended between a rigid or semi-rigid yoke. In none of its three forms does Lucas read on the patent in suit. Here again, all that is demonstrated is that some of the elements of the patent in suit are old in the art.

Bignon calls for a pre-curved rubber element containing several types of flat, crimped or coiled springs suspended between the ends of a rigid yoke. For reasons previously cited with respect to similar devices, Bignon does not read on the patent in suit.

The final foreign patent cited by defendant is Linke-Hoffmann German Patent 689,339. This patent discloses a rubber wiping element triple-notched at its top to form four sections. To each section is clamped a U-shaped member extending approximately the full length of the section, with a hole drilled through its center. Through this hole, each of both groups of two of the U-shapes are movably, but not slidably, connected to an encompassing larger U-shape extending approximately the length of the two smaller U-shapes. The longer U-shapes in turn have holes placed intermediate their ends and are also movably, but not slidably, connected to a large primary yoke encompassing the entire length of the blade. The device is thus suitable for wiping a curved glass having a rubber element flexible, though not uniformly so, toward and away from a windshield. The device is also cumbersome and heavy and apparently not economically suited to commercial production. Of all of the general prior art cited by defendant, Linke-Hoffmann comes closest to anticipating the patent in suit. It employs a form of triple-yoke structure akin to Anderson's. But Linke-Hoffmann lacks the flexible backing strip, slidably connected to secondary yokes, with primary and secondary yokes slidably movable in relation to each other. Even if the foregoing were not so, it is obvious that Linke-Hoffmann does not possess the unique combination of elements found in the patent in suit. It simply shows that some of those elements are old in the art. This would even be so under the doctrine of equivalents, since Linke-Hoffmann does not operate in a manner equivalent to that of the patent in suit. Linke-Hoffmann does not read on the patent in suit, as was decided by the Patent Office when it cited Linke-Hoffmann as a reference in issuing the patent.

In summary, with regard to the Prior Art, excluding the Zaiger triple-yoke device, this court finds that none of the patents cited by defendant reads upon the patent in suit. As has been observed, the most that the prior art cited by defendant discloses is that the elements of which the patent in suit is composed are largely old in the art. As defendant has pointed out in its brief, triple-yoke devices have been used in various ways

since at least the days of the Roman Empire. The prior art discloses such elements as a rubber blade flexible in a single plane toward and away from a windshield, flexible backing strips, slidable metal-to-metal connection between yokes and backing strips and yoked pressure distributing members of several types. But in no instance does the prior art disclose the unique combination of elements found in the patent in suit.

■ Defendant attempts to separate those elements of the patent in suit regarding the flexible blade and plural pressure points from those respecting the triple-yoke pressure distributing means. If each element of a patent were forced to stand alone without relation to the other elements of the patent, undoubtedly no device would be patentable. A device may be composed of elements old in the art, or composed of several combinations of elements old in the art, and still be patentable, if the device as a whole is unique and/or achieves a unique, useful result. Defendant may attack individual elements of the patent, but its attack cannot succeed unless directed to the patent as a whole, as embodied in claims 6, 8, 15 and 17. It is immaterial that one element may be old in the art; another a mere reversal of parts; or a third, a simple duplication of existing devices, if the whole device is unique. Reading the patent as a whole, that is, considering the drawings and specifications to the extent that they are covered by claims 6, 8, 15 and 17, it is clear that the patent in suit discloses a primary yoke slidably attached to two secondary yokes intermediate the ends of those secondary yokes, which secondary yokes are slidably attached at their ends at at least three longitudinally spaced points to a flexible backing strip with provision for abutment means, which strip holds a rubber blade flexible in a single plane toward and away from a windshield. This combination was, at the time of the application for a patent, in relation to the prior art already considered, new in the art, forming an article of distinct character and formation; and it produced a result which was due to the joint and cooperating action of all of the elements, not a mere aggregation of separate contributions. The patent in suit clearly falls within the rule laid down in Colgate-Palmolive Co. v. Carter Products, 4 Cir., 230 F.2d 855, 862, wherein Chief Judge Parker quoting from United States Industrial Chemical Co. v. Theroz Co., 4 Cir., 25 F.2d 387 and 20 R.C.L. 1125 stated " 'A combination is a composition of elements, some of which may be old and others new, or all old or all new. It is, however, the combination that is the invention, and it is as much a unit in contemplation of law as a single or non-composite instrument. The authorities establish the following propositions respecting the patentability of devices or processes of this character: (1) That a combination is patentable if it produces new and useful results, though all its constituents were well known and in common use before it was made, provided the results are a product of the combination, and not a mere aggregate of several results, each the product of one of the combined elements. (2) If it produces a different force, effect, or result in the combined forces or processes from that given by their separate parts, and a new result is given by their union. (3) If it either forms a new machine of distinct character or formation, or produces a result which is not the mere aggregate of separate contributions, but is due to the joint and co-operating action of all the elements. (4) When the several elements of which it is composed produce by their joint action either a new and useful result, or an old result in a cheaper or otherwise more advantageous way.' "

It is the feeling of the court that the stringent language of the Supreme Court in Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162 does not restrict, but rather strengthens the language of Judge Parker. See also Ingersoll-Rand Co. v. Black & Decker Mfg. Co., 4 Cir., 192 F.2d 270.

■■ It is well understood that the granting of a patent is prima facie evi-

dence of its validity, and the presumption is strengthened when the best prior art was cited and disregarded in the Patent Office. Cold Metal Process Co. v. Republic Steel Co., 6 Cir., 233 F.2d 828; Artcraft Silk Hosiery Mills v. Gotham Silk Hosiery Co., 3 Cir., 72 F.2d 47. This presumption of validity is further strengthened where the question of patentability has been actively contested in long continued proceedings in the patent office (Goodwin v. Borg-Warner Corp., 6 Cir., 157 F.2d 267) and where the patent issues after an interference proceeding. Aghnides v. S. H. Kress & Co., D.C., 140 F.Supp. 582; Hansen v. Safeway Stores, 110 U.S.P.Q. 170. In order to anticipate a patent on a combination of elements, it is necessary to find that combination in the prior art—Memphis Metal Mfg. Co. v. Consolidated Venetian Blind Co., D.C., 142 F.Supp. 279. There appears to be nothing in the prior art, excluding the Zaiger triple-yoke device, sufficient to overcome the strengthened presumption of validity which attaches to the Anderson patent. This is true even though the strengthened presumption attaches here only to claim 6 of the patent. Claims 8, 15 and 17 were added to the patent after the conclusion of the interference proceeding and thus were subjected only to the test of the prior art cited by the patent office at the time of issuance.

However, it is to be noted that while the court is unable to find any anticipatory device among the 19 patented and unpatented devices cited by defendant, practically every component of the Anderson combination can be found among those devices. Some devices contain more than one of the elements, and Linke-Hofmann, in particular, contains several. It should also be noted that the patent is limited on its face by its title "Windshield Wiper Blade Linkage Assembly", the patent thus covering not the wiper blade as a whole, but rather that part of it between the rubber element and the point at which the wiper arm attaches. On these grounds, and on others recited below, it is necessary that the claims of the patent in suit be construed with some strictness.

## Prior Art III

The Zaiger blade (Ex. D-15) is a device composed of a triple yoke pressure distributing mechanism, connected with some degree of looseness to a U-shaped channel backing strip with notched or hinge portions cut into both sides of the U-shape at longitudinally spaced points, principally flexible in a vertical plane. The yoke members are not movable with respect to each other, and an examination of D-15 does not disclose whether or not a slight movability between the yokes and backing strip therein results from intentional design or minimal tolerance standards.

Exhibit D-15 is alleged to have been hand-made in 1941 by one Israel Nesson, an engineer employed by Lion Products Co., predecessor firm to the Zaiger Company. A great deal of evidence tending to confirm or refute the method of manufacture claimed by Nesson was introduced at trial. Plaintiff claims that D-15 is a spurious exhibit. The evidence on this point was largely derived from the physical characteristics of D-15 itself. Without attempting to set forth that evidence in detail here, it can be said that it generally concerned such things as (1) the absence or presence of burrs, and their location along the sides of the hinge portions of the channel; (2) the relative location and shape of opposing hinge portions on each side of the channel; (3) the location of the faces at the root of the hinge portions; (4) the character of the face of either end of the channel; and others.

There are an apparently infinite number of variables which could affect these characteristics. Such things as the quality of the metal used in the channel; the character of the die used to form the channel; whether a band or reciprocating machine or handsaw, with any number of degrees of sharpness of teeth, placing of teeth, etc. was used to cut the hinge portions; whether the edges of the notches were filed or not; these are just a

few of the variables. They are, almost without exception, variables whose exact nature is absolutely beyond human determination. Only a knowledge of the variables could determine the method of manufacture. It is interesting to note, in this connection, that exhibit D-98, a model of D-15, constructed by defendant's expert, Fishleigh, in the manner in which Nesson testified that D-15 was made, itself shows strong evidence that it was not manufactured in that manner (i. e. placing of the faces at the root of the hinge portions), but whether or not this is so depends on the exact character of the die used to form the channel member. This is but one of many variables respecting D-15.

Taking the whole of the evidence on this point, and combining it with a rigorous inspection of D-15, this court finds nothing which in sum indicates, with even the slightest degree of certainty, how D-15 was made. For every characteristic which supports Nesson's claims, another exists which supports plaintiff's claims, and vice-versa. The best that can be said for the evidence on this point is that it is highly inconclusive, and that D-15 itself is remarkably silent, or confused, with respect to its own origin.

This court refuses to indulge in speculation, or in methods which are not based upon facts in evidence, in order to decide whether or not D-15 is a spurious exhibit. And, therefore, the court finds that it is not possible to determine with any degree of certainty whether D-15 is genuine or not. Any decision on this point must be made by reference to the burden of proof assumed by defendant in this specific section of its action. Laying aside this question for the moment, consider the testimony of various persons relating to the existence and use of the Zaiger triple-yoke blade in 1941. It should first be noted that some of the witnesses here referred to did not appear at the trial. Rather, they submitted to pretrial depositions, which were subsequently filed with the court, parts of which were read into the trial record. The court thus has had no opportunity to assess at first hand the credibility of those witnesses, and is limited in its conclusions in this respect to facts regarding the interests and relationships of the witnesses.

A considerable amount of testimony of one Max Zaiger was introduced at the trial. Mr. Zaiger, President and substantial owner of the Zaiger Company, and its predecessor firm, The Lion Products Company, testified to the development of the triple-yoke blade by one Israel Nesson. After several handmade samples of the blade had been produced, Mr. Zaiger took them around to various prospective customers. Among these were Stewart-Warner Corp., Packard Motor Car Co. and Studebaker Corp.

There was introduced into evidence the testimony of one S. M. Berg, a sales engineer at Stewart-Warner for the past 21 years. He evidenced a specific and particularized memory of receiving a blade identical to D-15 in 1941, though he could produce no models of the blade, nor any documentary evidence of their existence. Berg further testified that one J. B. Whitted, a project engineer for Stewart-Warner had received blades like D-15 at the same time. Mr. Whitted, who left Stewart-Warner in 1943 and is now in business for himself, testified that he had no recollection of seeing a blade like D-15, but was certain that the blade which he did see was a triple-yoke rigid back blade, probably like D-10. Since Mr. Whitted was directly concerned with the development of wiper systems, even though Stewart-Warner did not manufacture, or contemplate manufacturing, wiper blades, Mr. Whitted's controverting testimony tends to cast doubt on Mr. Berg's testimony.

Testimony was introduced of one Lester L. Beltz, who in 1941 was Chief Electrical Engineer at Packard. He had known Mr. Berg for some 20 years and also knew Max Zaiger. Mr. Beltz testified unequivocally to having been given a blade identical to D-15 early in 1941 by Mr. Zaiger. He testified that he had received in all some six or seven pairs of blades like D-15, that he had directed

that they be subjected to testing at Packard, and that he had observed some of the tests. However, none of the blades, nor any documentary evidence respecting the blades or their testing was produced. Of all the testimony in this area, that of Mr. Beltz is clearest, and supports defendant's contentions regarding the Zaiger blade more strongly than any other testimony. It further is positive, uncontradicted testimony and not inherently improbable. Therefore, this court may not ignore it. Kelly v. Jackson, 6 Pet. 622, 31 U.S. 622, 8 L.Ed. 523; Stone v. Stone, 78 U.S.App.D.C. 5, 136 F.2d 761.

It should be noted here that the triple-yoke blade is alleged to have been developed in response to a request from Studebaker Corp. Studebaker went so far as to ship a sample curved windshield to Zaiger to assist him in his development work. Outside of Mr. Zaiger's statement that he took several samples similar to D-15 to the Studebaker plant at South Bend, Indiana, the record is silent with respect to Studebaker. No testimony of persons connected with Studebaker, nor documentary evidence of Studebaker regarding either the development work or the triple-yoke blade was introduced.

Two other persons who testified were F. O. Wood and Mrs. Rose Lipkus. Mr. Wood was service manager of a garage at which Mr. Zaiger kept his automobile, and testified that he had seen blades like D-15 on Mr. Zaiger's car, and recalled talking to Mr. Zaiger about them. Mr. Wood's testimony is uncontroverted, but it should be pointed out that, at least at the time concerned in his testimony, Mr. Wood had an interest governed by Mr. Zaiger's patronage. Mrs. Lipkus, who was Mr. Zaiger's secretary for a period of 18 years, from 1933 to 1952, testified at length regarding the triple-yoke blade and the business trips of Mr. Zaiger with respect to that blade. It was somewhat contradictory regarding his business trips, though this is quite understandable in view of the time lapse involved.

However, Mrs. Lipkus' long employment by Mr. Zaiger, while not in itself enough to discredit her testimony, is sufficient to cause the court to regard it with caution.

The same must be said about the testimony of Israel Nesson. As the claimed developer of the Zaiger blade, and in view of his long and continuing association with Mr. Zaiger, his testimony, too, should be viewed with caution. There was also introduced testimony by one Harold Nesson, the brother of Israel Nesson, that he had observed a blade similar to D-15 in operation on a number of occasions in 1941. Harold Nesson's testimony must generally be considered in the same light as that of his brother.

Finally, Mr. Zaiger must be considered as anything but a disinterested witness. This is especially so in view of the fact that he is a competitor of plaintiff, and is also a defendant in a patent-infringement suit brought by this plaintiff in another United States District Court.

The foregoing brief sketch of the testimony respecting the Zaiger blade summarizes that testimony by casting doubt upon its credibility. This summary, plus the nebulous physical evidence of D-15, makes it obvious that the entire matter regarding the Zaiger device is anything but clear-cut. And though the evidence must raise some doubt, one would have to suspect some immense conspiracy, and indulge in, as Learned Hand once put it, "an excess of scepticism unjustified by any cannon" (Turner Dock Transfer Co. v. Terminal Engineering Co., 2 Cir., 94 F.2d 79, 80) to entertain a reasonable doubt regarding the existence and use of the Zaiger device. The evidence viewed as to certain of its particulars, and reviewed in toto, raises doubts certainly, but this court can find in it no basis for a *reasonable* doubt respecting the Zaiger device. The evidence, whether measured by the standard of proof beyond a reasonable doubt, or merely a preponderance of the evidence, is sufficient in the judgment of this court to establish the existence, use and character of the Zaiger device substantially as urged by defendant.

It is the finding of this court, therefore, that at least a dozen devices substantially the same as exhibit D-15 were handmade in 1940 by Israel Nesson, and that some of these were distributed to the trade by Max Zaiger as samples, with the obvious purpose of procuring orders for them. Thus we find a distribution of samples and an offer for sale sufficient to support both prior knowledge or use of the Zaiger device. It is sufficient under the law to establish either prior knowledge or prior use alone. Application of Shackell, 194 F.2d 720, 39 C.C.P.A., Patents, 847. The cases also make it clear that to constitute a public use, only one specimen of the article need be used. Consolidated Fruit-Jar Co. v. Wright, 94 U.S. 92, 24 L.Ed. 68; Smith & Griggs Mfg. Co. v. Sprague, 123 U.S. 249, 8 S.Ct. 122, 31 L.Ed. 141; Bourne v. Jones, 5 Cir., 207 F.2d 173, certiorari denied 346 U.S. 897, 74 S.Ct. 220, 98 L. Ed. 398; that use by one person alone is sufficient, Egbert v. Lippmann, 104 U.S. 333, 26 L.Ed. 755; Jordan v. Hemphill Co., 4 Cir., 180 F.2d 457; that the article need not have been on public display if ordinary use would keep it veiled from the view of the general public; Hall v. Macneale, 107 U.S. 90, 2 S.Ct. 73, 27 L. Ed. 367, and that use by a donee constitutes public use, no sale or profit being necessary, Egbert v. Lippmann, supra; Paddies, Inc., v. Broadway Dept. Stores, D.C., 147 F.Supp. 373.

It appears from the testimony that the Zaiger device was offered for sale, and was further placed in public use by being used on automobiles on public thoroughfares in the Boston and Detroit areas in 1940. It appears further that Max Zaiger did not attempt to patent the device and that by the time of the application by Anderson for the patent in suit, Zaiger could not have obtained a patent because of the abandonment of his development as a result of the acts above related. Therefore, at the time of the application for the patent in suit, the Zaiger device had been dedicated to the public use for several years. H. Wenzel Tent & Duck Co. v. White Stay Mfg. Co., 9 Cir., 199 F.2d 740; Dennis v. Pitner, 7 Cir., 106 F.2d 142; Electric Storage Battery Co. v. Shimadzu, 307 U.S. 5, 613, 616, 59 S.Ct. 675, 83 L.Ed. 1071.

Therefore, it is necessary to determine whether or not the character of the Zaiger device is such that it reads upon the patent in suit. Perhaps the character of the Zaiger device, with regard to its anticipatory effect, can best be determined by reference to the well understood rule that "that which infringes, if later, would anticipate, if earlier." Knapp v. Morss, 150 U.S. 221, 14 S.Ct. 81, 84, 37 L.Ed. 1059; American Fruit Growers, Inc., v. Brogdex, 283 U.S. 1, 51 S.Ct. 328, 75 L.Ed. 801.

It is clear that claim 6 of the patent in suit calls for nothing that is not found in D-15. Claims 8, 15 and 17 differ from claim 6 in that they call for abutment means, and further in that claim 8 calls for "pressure distributing means having three portions relatively movable", and claims 15 and 17 further call for a relatively movable connection between the pressure distributing means and the blade assembly. As has been noted supra, the cause of the movable connection in D-15 between the triple-yoke and the backing strip is obscure. It may be simply the result of age, wear or minimal tolerance standards. It should be noted, however, that the circular openings placed in the backing strip are larger than the rivets passing through them, while the circular openings placed at the ends of the secondary yokes, at which point they attach to the primary yoke, appear to be just large enough to allow the rivets to pass through them. This may be due to accident, age, a softer grade of metal in the backing strip than in the yokes, or it may be by design. But the fact that the testimony indicates that this blade was subjected to little or no use, plus the close tolerances observable in the yoke, lends stronger support to the possibility of intentional design rather than any other cause. There can be no question of relatively movable connection between the yoke members, but, whatever the cause movability is present between the

triple-yoke and the backing strip. As to the abutment means, there is a good deal of lateral tilting observable in D-15. Again, this may well be the result of age and handling. But certainly, the abutment means provided for in the patent in suit are not more inherent in that design and structure than in the design and structure of D-15. The ears of the secondary yokes at the points at which they fit over the backing strip, do not appear to be parallel in D-15. If they were, the abutment means would be as sufficient as those of the Anderson device. It is to be noted that if the identically located ears of the secondary yokes in the Anderson device were spread, there would also be considerable lateral tilting in that device. In short, as between the Anderson and Zaiger devices, sufficiency of abutment means appears to be a question of variance of the strength of the metal used in the triple-yoke, rather than a variance of design.

In sum, the Zaiger device appears to read fully upon claims 6, 8, 15 and 17, with the exception of the relatively movable yoke members called for in claim 8, 15 and 17. This is not a significant variance from the patent in suit, though the result might well be different if there were no movability between the triple-yoke and the backing strip, in which event, the device would be inoperative. There is sufficient movability present in D-15 to allow the blade to conform to a curve within the limits imposed by the triple-yoke structure, as is true of all of the triple-yoke devices introduced in evidence in this suit. It might be noted here that models of the patent in suit introduced by plaintiff provide for at least two to three times as much relative movability as could possibly be used by the device, as patented.

█ Of the 31 claims of the patent in suit, 13 refer only to a single yoke structure and were transferred from another application; 6 claims were declared unpatentable by a patent office examiner prior to their final acceptance by the Patent Office; 9 claims were added to the patent after the interference proceeding and one claim was drafted by a Patent Office examiner. Of the claims of the original application, 23 were rejected outright by the Patent Office as unpatentable. It might be noted further that the only claim in suit to which the strengthened presumption of validity attaches, i. e., No. 6, is the only claim in suit which does not call for slidably attached yoke elements, or abutment means as essential elements of the patentable combination. The checkered career and character of the patent in suit, as it is revealed by the file wrapper, presents yet another reason why its claims must be narrowly construed. In view of the history of this patent, especially as set forth in its file wrapper, it can hardly be doubted that the patent office would have refused to issue the patent in suit, or any similar patent, had it known of the existence and background of the Zaiger device.

The court has no doubt that the Zaiger device D-15 would be found to infringe the patent in suit, if such question were presented to it.

█ It is the finding of the court that the Zaiger device D-15, a device which is a part of the public domain as a result of abandonment, substantially anticipates the patent in suit. The court therefore has no choice but to find that the grant of Letters Patent No. 2,596,063 to John W. Anderson on May 6, 1952 was erroneous, and that that patent is invalid.

### Infringement

█ In view of the above finding of the court, it is not necessary to go into the question of infringement of the patent in suit by the Trico "Rainbow" and "L-bow" devices. It was necessary to strictly construe the prior art in order to uphold the patent in suit. Furthermore, Anderson has never produced a commercial blade corresponding to that shown in the patent. All of the Anderson commercial devices simply resemble and embody only some of the characteristics of the patent in suit. This renders the patent in suit a so-called "paper" patent.

Thus, on dual grounds, it would be necessary for the patent in suit to be very

strictly construed, and while there might be a possibility of finding infringement with respect to the "Rainbow" device, such a finding could never be made with respect to the "L-bow" device.

### Indefiniteness of Claims of Patent in Suit

■ Defendant asserts that the patent in suit is invalid for the reason that its claims are indefinite, and that the claimed patentable subject matter is unidentified. Defendant appears to base its contention largely upon the following: That no degree of flexibility is set forth; that there is a difference in the wording of the various claims with respect to setting forth flexibility and other characteristics, and that this interchange renders the patent bewildering and impossible to understand; that no specific distances are set forth for the longitudinally spaced points at which the yokes attach to the backing strip; and finally, that nowhere in the patent can there be found words specifically setting forth the exact inventive concept.

Defendant appears to be describing almost every patent cited as prior art in this suit, including its own. The difficulty lies not with the patent in suit, but with the established and traditional methods of drawing patents. If the court were to adopt the simple and straight-forward view of patent language urged by the defendant at this point, and only at this point, hardly a patent in the land would survive.

The fact is that the language of the claims, especially when read together with the drawings and specification, while not a model of clarity, is as clear as the language of any patent is ever likely to be. Further, it is not at all necessary that specific degrees, measurements or distance be set forth here. And finally, to the charge of failure to set forth the specific inventive concept, the answer is simple (to the extent that it exists)—it lies in the device as a whole.

### Anderson not Inventor

■ Defendant urges upon the court the proposition that John Anderson is not the true inventor of the device shown in the patent in suit. As a basis for this contention, defendant relies upon a series of inferential arguments based upon the testimony of Fred A. Krohm and Theodore Smulski. Krohm and Smulski were employees of Anderson; did the development work, and made the various models, which eventually resulted in the device shown in the patent in suit. Defendant claims that Krohm, and possibly Smulski, were the actual inventors because of the character of their development work. Krohm and Smulski do not themselves claim to be the inventors, but by drawing inferences from their testimony, and casting doubt upon the so-called "flash of genius" development by Anderson, and questioning the character of the documents and drawings produced to support Anderson's contentions, defendant seeks to place the mantle of inventor on the shoulders of Krohm and Smulski. While defendant has thus constructed an interesting skein of argumentation, the court finds that there is nothing inherently improbable about Anderson's claim of invention, nor that defendant's inferences are the only ones which may reasonably be drawn from the testimony and acts of Anderson, Krohm and Smulski. The court finds defendant's argument and evidence on this point unconvincing, and is satisfied to accept the Patent Office's designation of John W. Anderson as inventor of the patent in suit.

### Unclean Hands

■ As a final argument, defendant urges that the court deny plaintiff all relief because they are without clean hands. As a basis for this, defendant makes the following claims: (1) that Anderson's preliminary statement to the Patent Office was untrue, and (2) that documents offered to support that statement were forgeries and spurious in character. This court does not intend to here review the evidence on this point in any detail. Having reviewed the evidence, however, the court finds that it is not sufficient to support charges as serious as these, by whatever reasonable stand-

ard the evidence is measured. Further, the charge of fraud on Anderson's part by misrepresenting an alleged long-felt need for his wiper, does not merit serious consideration.

Charges of this sort are probably inevitable in some patent litigation. However, the court feels that there is no place in this suit for what is little more than a personal attack upon the inventor.

Defendant's counterclaim of unclean hands, fraud and misrepresentation on the part of John W. Anderson, is hereby dismissed.

■ The decision in this matter is not an easy one. With all the bravado and astuteness indicated by the defendant through its witnesses and counsel, the record, nevertheless, indicates that the Scinta-sole and Scinta-Rappl blade did *not* come into existence until after Mr. Anderson read his paper describing the patent in suit. On the other hand, the "dream" of Mr. Anderson as to the conception of an "entire new blade construction" tends to strain one's credulity. It is regretable that the two largest manufacturers of windshield wiper equipment, the defendant with upwards of 90% of the new business, and the plaintiff with the largest percentage of replacement business in this market, would engage in the charges and counter charges now a matter of public record through the means of pleadings filed and testimony transcribed. After careful attention to the testimony and a reading and re-reading of the pleadings and briefs, as well as the transcribed record, this court entertains the opinion that there is a place in the automotive market for each of these companies. The ultimate decision in favor of the defendant is based solely on the Zaiger blade. The very definite doubt concerning that blade has already been expressed. Substantially uncontroverted, however, it remains as evidence in this case. It is my considered opinion that there should be no costs awarded herein.

Decision for plaintiff in part and for defendant in part, as noted above. Draft order accordingly and submit on notice.