The **ANDERSON COMPANY**, a corporation, Plaintiff,

v.

**SEARS, ROEBUCK & CO.**, a corporation, and **The Zaiger Corporation**, a corporation, Defendants.
Civ. A. No. 56 C 463.

United States District Court
N. D. Illinois, E. D.
July 3, 1958.

John Rex Allen, James C. Wood (of Schroeder, Hofgren, Brady & Wegner), Chicago, Ill., and James P. Hume (of Wilkinson, Huxley, Byron & Hume), Chicago, Ill., for plaintiff and counter-defendant.

Frank H. Marks (of Lederer, Livingston, Kahn & Adsit), Chicago, Ill., and Arthur D. Thomson, Boston, Mass., for defendants and counterclaimant.

JULIUS J. HOFFMAN, District Judge.

### Findings of Fact

### On Issues Raised by Complaint

1. This suit was instituted by the plaintiffs, The Anderson Company and Productive Inventions, both Indiana corporations, the latter having been merged into the former so that plaintiff, The Anderson Company, hereinafter called plaintiff, remains. The defendants are Sears Roebuck and Co., a New York corporation, and The Zaiger Corporation, a Massachusetts corporation. The Complaint charges infringement of U. S. Letters Patent 2,596,063 by reason of sales by both Sears and Zaiger of windshield wiper blades manufactured by The Zaiger Corporation, hereinafter called Zaiger.

2. Patent No. 2,596,063 issued May 6, 1952, as a result of an application filed December 13, 1945, by plaintiff's president, John W. Anderson, for an invention entitled, "Windshield Wiper Blade Linkage Assembly", the patent now being owned by plaintiff along with all rights thereunder together with the right to recover for past infringement.

3. Patent No. 2,596,063 discloses and claims a unique combination of mechanical elements resulting in a windshield wiper which is the only wiper developed to date which can wipe curved windshields successfully and which wipes all windshields whether curved, flat or irregular, better than any prior art wiper. The combination includes basically a flexible blade having a rubber part and a flexible resilient backing member which confines flexure of the blade to a single plane and a pressure distributing assembly connected to the blade at the ends thereof and at least one point intermediate the ends, the connection being such that lost motion between the assembly and flexible blade will permit surface conforming flexure in a single plane perpendicular to the glass.

4. The structural combination of patent No. 2,596,063 provides for the first time a wiper which in operation conforms to all surface irregularities and curvature which may occur in parts of a windshield glass intended to be wiped. The combination of the pressure distributing assembly and the flexible, resilient backing for the rubber maintains all parts of the rubber wiping edge urged toward the glass at all times. This performance of a windshield wiper structure was new and different from any known before the application for the patent in suit was filed.

5. The commercial success of the plaintiff's blade has been extraordinary. When the blade was first put on the market there were no curved glass windshields but the Anderson blade wiped flat glass so much better than rigid backed blades that several million of plaintiff's blades were sold before curved glass windshields appeared, even though these blades cost the car owner twice as much as any other blade on the market at that time. Within a year of the

**614**

appearance of the Anderson blade on the market Trico copied it and a year later Zaiger did likewise.

6. Before curved windshields were standard equipment, all windshields were flat and Trico sold substantially all blades used for original equipment. Now plaintiff sells a substantial amount of original equipment blades. Plaintiff's sales of the subject blade during the first year amounted to one million blades. In 1956 plaintiff sold ten million blades, of which 38% was for original equipment and 62% for replacement.

7. The record indicates that this commercial success was due to the inherent qualities resulting from the invention of the patent in suit. It is clear that the sales for original equipment were due to the performance of the blade, that plaintiff's modest advertising had very little to do with the replacement sales, and that later developments and improvements by plaintiff were of minor importance in the commercial success of the blade.

8. That the invention of the patent in suit was clearly the major reason for the commercial success is confirmed by the fact that all blades for wiping curved windshields in the United States and Europe presently employ the structure of the claims of the patent in suit and by the fact that not a single one of the prior art patents for wiping curved windshields alleged to anticipate the invention has never gone into commercial use. Furthermore, many of these patents are owned by the very companies making or using plaintiff's patented windshield wipers or copies thereof.

9. The application for the patent in suit while in the Patent Office was involved in a contested interference with an application for patent owned by Trico Products Corp. Anderson was awarded priority of invention by the Patent Office Interference Examiner and the award was affirmed by the Patent Office Board of Appeals and the Court of Customs and Patent Appeals.

10. Since 1948 Zaiger has manufactured windshield wipers intended for wiping curved windshields. Such wipers are exemplified by plaintiff's Exhibits 18 through 21, inclusive. Zaiger admits that these wipers infringe patent No. 2,596,063.

11. Zaiger agreed to indemnify defendant, Sears Roebuck and Co. against liability on account of infringement arising from the sale of wipers manufactured by Zaiger and has conducted the defense of this action.

12. The defendants, in answer to the Complaint, alleged that patent No. 2,596,063 did not disclose invention over patented prior art. This prior art fails to disclose the invention of the patent in suit.

13. The patented prior art generally discloses three kinds of wipers: straight wipers having pressure applied at spaced points to a rigid channeled holder and which cannot conform to a curved surface; pre-curved wipers, parts of which tend to move away from rather than toward a windshield particularly when attempting to wipe straight portions of the shield; and a bow string type wiper in which the rubber is stretched like the string of a bow.

14. The prior patents set up in defendants' Answer showing straight wipers, include the following: Stadeker, No. 1,510,509; Zaiger, No. 2,087,178; Zaiger, No. 2,149,037; Zaiger, No. 2,206,343; Zaiger, No. 2,234,791; Zaiger, No. 2,276,556; Horton, No. 2,303,694; Larson, Canadian Patent No. 345,867; and Linke-Hoffman, German Patent No. 689,339, all of which were before the Patent Office during prosecution of the patent in suit with the exception of Zaiger, No. 2,234,791 which is no more pertinent than the other Zaiger patents. The Stadeker and Zaiger patents all show one-piece, straight, rigid channeled holders for the rubber with a single yoke exerting pressure at two spaced points on the holder. Horton and Larson show a two-piece holder, each piece of which

is a straight, rigid channel member, the two pieces being arranged end to end and with pressure applied at one point on each holder. Linke-Hoffman has four rigid channel-shaped holders clamped tightly upon a single rubber strip. These holders maintain the rubber straight throughout their respective lengths and the rubber is cut out so that it is hinged between the straight sections. The rigid holders are pivotally mounted in a pair of channel-shaped yokes in turn pivotally mounted in a single box-like yoke extending over the entire length of the blade. Pressure applied to the box-like yoke is transferred to each of the rigid yokes clamped to the rubber. There is no flexible backing member for the rubber in the Linke-Hoffman structure. The Court witnessed a demonstration of a model of Linke-Hoffman and observed that the structure cannot wipe a curved glass satisfactorily.

15. The prior patents set up in defendants' Answer which show pre-curved blades include the following: Zierer, No. 2,254,343; Scinta et al., No. 2,543,383; Vauxhall, British Patent No. 427,383; and Bignon, French Patent No. 820,156, each of which was before the Patent Office during prosecution of the Anderson patent in suit. Each of the pre-curved blades includes a metal holder for the rubber which is pre-curved to the sharpest curvature which the blade is expected to encounter. A windshield wiper on curved windshields must continually change its shape to accommodate the varying curvatures encountered ranging from sharply curved to almost straight through each passage over the glass. The pre-curved blades tend to maintain their pre-curvature and to lift the wiping portions of the edge away from the glass, particularly when attempting to wipe where the glass is straight. The pre-curved blades, as shown in these patents, do not and cannot successfully wipe curved windshields.

a. Zierer patent No. 2,254,343 discloses a blade for wiping a particular curved glass. Its structure includes a rigid holder having a pin at each end passing through the rubber of the blade; a pre-curved flat metal back secured to the rubber; a cam mounted in the rigid holder and pressing upon the middle of the pre-curved back; and a pair of arms, one for moving the blade back and forth in its arc and the other for turning the cam to press on the back of the pre-curved blade to change its shape. The shape of the blade is controlled by the cam whether the blade is in contact with the glass or not. The shape of the Zierer blade is chosen in advance according to a pre-arranged program, it cannot wipe any but the curved windshield for which the cam is designed and has the disadvantage of being pre-curved and hence cannot wipe that glass successfully.

b. Scinta et al. patent No. 2,543,383 shows two embodiments of a pre-curved wiper. The patent contains description of structure different from that included in the original application. The application as filed contained two embodiments each of which had a stack of pre-curved leaf springs enclosed by rubber. Pressure of a supporting wiper arm is applied at the center of the wiper. The embodiments differ in that in one, the wiping edge is integral with the rubber enclosing the leaf springs, and in the other embodiment the wiping edge is separate but secured to the ends of the pre-curved leaf spring structure. The structure of the Scinta et al. patent has the disadvantage of being pre-curved. Trico Products Corp. tried to get the application for this patent into interference with the patent in suit but the Patent Office held it did not disclose the same invention. This is also the finding of this Court.

c. Vauxhall patent (British) No. 427,383 shows a pre-curved wiper having no pressure distributing assembly and no backing strip, the blade also having the disadvantage of pre-curvature, as mentioned above.

d. Bignon patent (French) No. 820,-156 shows a number of pre-curved wipers

incorporating various shapes of metal associated with the rubber. In each, arm pressure is applied at a single point at the center of the metal. Figure 1 of the French patent drawings shows a straight blade with pressure applied adjacent the ends. At best, Bignon contains prophetical statements of a desired result without showing a structure for obtaining them.

16. The prior patents set up in defendants' Answer include Lucas, British Patent No. 433,467, which discloses a blade referred to as a bow string type. The rubber of the blade is placed in tension by stretching the blade between the ends of a support. Since the rubber is stretched straight, it will bridge over any depressions and fail to wipe irregularities which occur in windshield glass. The patent structure does not include the combination of the Anderson patent in suit.

17. Defendant also introduced evidence of an alleged prior use of a windshield wiper which as hereinafter set forth was alleged to have been made by an employee of Zaiger, then known as Lion Products Company, in 1941, and which was identified as defendants' Exhibit 15 or D–15. This wiper was alleged to be the only remaining example of three or four dozen similar blades made at the same time and in the same way.

18. Defendants' physical Exhibit 15 is a wiper having a channel-shape metal holder for the rubber similar to the channel-shaped holders used for straight, rigid blades of The Zaiger Corporation manufacture. The channel-shaped holder in Exhibit 15 has seven slots dividing the channel into separate rigid segments. The metal at the base of the slots connects the rigid segments acting like a hinge. A pressure distributing assembly or superstructure is attached to the holder for the rubber and includes a pair of secondary yokes having ends respectively straddling the holder with rivets passing through holes in the ends of the yokes and the holder, and a primary yoke riveted at each end to a central portion of the secondary yokes. A clip on the back of the primary yoke is provided for receiving an arm in the usual manner.

19. Defendants' Exhibit 15 does not have a uniformly flexible backing. The rigid segments and intervening hinges of the channel-shaped holder hold the rubber in a number of straight, rigid segments hinged together and the blade cannot conform to a curved windshield.

20. Defendants' Exhibit 15 does not have a resiliently flexible backing for the rubber but has a soft stainless steel channel-shaped holder which takes a permanent set when bent at the hinges between the rigid segments.

21. Defendants' Exhibit 15 does not have structure to confine bending or flexure of the blade to a single plane. The Exhibit is kinked and bent at the hinges between rigid segments indicating that the blade does not possess stability against flexure laterally.

22. Defendants' Exhibit 15 may apply pressure from the ends of the secondary yokes to the rigid segments to which the ends are connected, but the channel-shaped holder for the rubber does not distribute pressure from the rigid segments to which the yokes are attached, to other segments therebetween as the hinges are incapable of such distribution of pressure. The blade does not have structure for maintaining or urging the entire rubber wiping edge into contact with glass to be wiped.

23. Mr. Israel Nesson testified that defendants' Exhibit 15 was one of three or four dozen blades made at the same time and in a particular manner. This included the stacking of three or four dozen long metal blanks. At Nesson's first deposition, he stated the blanks were flat; at his second deposition, he stated they were corrugated. These blanks were clamped between a top and a bottom piece of cold rolled steel. The stack was marked with a pencil where the slots were to be formed. The stack was then guided by hand against a metal band saw, cutting the slots in one side of the

blanks and thereafter the stack was turned around to cut the slots in the opposite side. Following the cutting of seven slots in one side, and then the seven slots in the opposite side of the blanks, the individual metal pieces were formed into U-shape in regular forming dies of The Zaiger Corporation.

24. Defendants' Exhibit 15 is spurious, as proved by facts concerning its physical structure including the following:

a. The slots on both sides of the channel holder for the rubber are spaced unequal distances apart. The spacing of the slots on one side of the holder matches the spacing on the opposite side of the holder so that the slots are spaced almost identically in pairs indicating that opposite slots were formed at the same time after the holder was formed into U-shape.

b. Different slots in the channel holder are cut at different angles to the edge of the metal, some are slanted to the left; some are slanted to the right; but opposite slots of each pair are cut at the same angle showing the slots to be substantially identical as to their angular orientation in the metal of the channel holder and further indicating that opposite slots were formed at the same time in the holder after it was formed into U-shape.

c. The slots vary in their shape; some being wider at the base than at the mouth; some more rectangular; and some wider at the mouth than at the base. Opposite slots in the channel holder have the same shape indicating the slots to be substantially identical pairs further indicating forming at the same time and after the metal holder was in U-shape.

d. The hinge portions between the rigid segments of the channel-shaped holder have edges which prevent the viewing of the thickness of the metal. Had the slots been cut in the metal prior to the time that the metal blank was formed into U-shape in forming dies, the thickness of the metal of the hinge portion would be clearly visible in viewing the blade in side view since the metal hinges would not be rounded as occurs in the die forming operation. There is no thickness of metal visible at the hinge portions of defendants' Exhibit 15 and the edge of the hinge appears to be a line indicating that the slot was cut after the metal was in U-shape.

e. The metal holder of defendants' Exhibit 15 has marks on its side indicating that the pressure of forming dies was impressed upon the metal. These marks are called "draw marks". Metal burrs appear at the edge of the slots and some of the burrs overhang and are on top of the draw marks. The draw marks from the die were placed on the metal prior to the sawing of the slots indicating that the metal holder was in U-shape before the slots were formed.

f. Defendants' Exhibit 15 has burrs on both sides of the various slots formed in the channel-shaped holder. These burrs were demonstrated to be of a character distinctly different from those formed by a metal band saw operating upon the type of metal of which the channel holder of defendants' Exhibit 15 is formed.

25. Two witnesses testified in open Court concerning the structure and character of defendants' Exhibit 15. Mr. Stephen A. Crosby, one of the witnesses, is an engineer in the employ of The Anderson Company since 1955 and has been working in the business concerning the manufacture of windshield wiper blades since that time. He is also a registered professional engineer, licensed in Illinois, having taken the required examination for such license. The Court has observed the demeanor of the witness Crosby and observed that he answered all questions of counsel for both parties in a forthright manner and limited his answers to facts honestly within his knowledge. The conduct of the witness Crosby made his testimony convincing and corroborated its inherent probability. The testimony of the witness Crosby concerning the spurious character of

defendants' Exhibit 15 was demonstrated to the Court by visual aids so that the facts testified to were equally apparent to the Court.

26. The other witness who testified concerning defendants' Exhibit 15 was Harry D. Wass, an independent tool and die manufacturer from whom The Zaiger Corporation purchased tools and dies for making windshield wiper blades from 1933 to the present date. Mr. Wass has spent most of his life as a tool and die maker. He brought into Court some temporary dies made in the shop of The Zaiger Corporation in the absence of Mr. Wass. Mr. Wass has a tool and die shop and a number of employees engaged in making tools and dies; however, the temporary dies brought into Court were made at The Zaiger Corporation shop, Mr. Wass stating that his shop was too busy. Mr. Wass attended the trial of this cause from its second day through most of the three and a half weeks of the trial.

27. The witness Wass testified as to the forming of marks and burrs on defendants' Exhibit 15 by use of a file. No visual aids or exhibits were presented, so that the Court was unable to view the marks or burrs mentioned. The Court observed the demeanor of the witness Wass and believes there to be doubt as to the conclusions stated by the witness as to how defendants' Exhibit 15 was formed.

28. Temporary dies brought into the Court by the witness Wass were used to bend metal blanks into U-shape and these blanks have a die line near the base of the U, clearly visible to the naked eye. Defendants' Exhibit 15 does not have such a die line. Defendants' Exhibit 15 was not formed in a die like the temporary dies produced by the witness Wass and thus not as Nesson testified.

29. The testimony of both experts proves conclusively that D–15 was not made as Nesson testified and to that extent is not conflicting. The witnesses did

not agree as to whether the slots were made with a hack saw as Crosby testified or by a file as Wass testified. The Court finds that they were made in accordance with Crosby's testimony.

30. The Court also heard the testimony of the witness Crosby concerning the patent in suit, the accused structures and the patented prior art and finds that such testimony which supports many of these findings, was clear, unequivocal and convincing. Mr. Crosby's testimony was illustrated and demonstrated for the edification of the Court by charts, models of prior art structures and otherwise. His testimony indicated that he is well acquainted with the structures and manufacture of windshield wipers generally, the plaintiff's wipers, and defendants' accused wipers. Defendants' expert's testimony cast no doubt whatsoever upon Mr. Crosby's testimony.

31. Max Zaiger, the president of The Zaiger Corporation, was the chief fact witness for the defendants with respect to D–15. The court observed the demeanor of the witness on the stand, heard him attempt to avoid direct answers and finds that in many instances he equivocated. The evidence shows a persistent disposition of Max Zaiger to influence deceptively and to his interest not only this court but also witnesses upon whom he expected this court to rely.

32. In addition to the other equivocations later pointed out, Max Zaiger admitted that he had a telephone conversation in 1953 with Mr. Anderson about the Trico suit but denied that he offered to help Mr. Anderson with the patent part of the suit or wanted some reward for his help. A transcript of the phone conversation which had been recorded was received in evidence over the objections of defendants' counsel and disclosed that such denials were not true. Furthermore Max Zaiger's testimony about the conversation was shown to be contradictory to his testimony in the Trico suit where he was examined by deposition on the same subject.

33. Max Zaiger testified that Studebaker had sent him a curved or bent windshield in 1941 and requested him to make a blade to wipe it, that he told his engineer Israel Nesson to make a blade for this purpose and that Nesson in late April or May of 1941 gave him 40–50 blades which were identical, that one of these was D–15 which he put away in a cabinet where he kept samples of certain blades, which cabinet was never locked. He further testified that he witnessed tests of other blades like D–15 and the results were satisfactory.

34. Max Zaiger further testified that he and his sales employee Mixon then went to Detroit where they gave blades to Berg of Stewart-Warner and Beltz of Packard for testing and then went to South Bend where blades were given to Wagar of Studebaker for the same purpose. He said that he then went home and had two blades placed on his car for test purposes which tests were conducted for several months and were satisfactory.

35. Documentary proof that Studebaker sent Zaiger a windshield in March of 1941 is in the record. These documents disclose the results of a test of a blade, not like D–15, which was a failure. No documentary evidence of results of tests of blades like D–15 was offered. This is strong circumstantial evidence that no such tests were made. There was also documentary evidence that Zaiger and Mixon made a trip to Studebaker prior to April 15, 1941.

36. By deposition defendants introduced the testimony of several witnesses regarding alleged wiper blades like D–15 which were supposed to have been tested in 1941. Max Zaiger admitted that he saw these witnesses before they testified, showed them D–15 and advised them that it was like the blade he had given or showed them many years before and that he showed it to them in 1941.

37. Lester Beltz testified for defendants by deposition. He said he was an electrical engineer for Packard until 1946, that because of Packard's interest in wiping curved windshields in 1941 Max Zieger and his salesman Mixon gave him two blades to test and later sent him six more blades for the same purpose. He testified these blades were tested satisfactorily in the Packard experimental garage on flat glass. No written reports of such tests were produced. Written reports of a test of a substantially different rigid back Zaiger blade in 1941 were produced.

38. Plaintiff produced in court two witnesses Smith and Johnson to controvert this testimony. Smith testified that in 1941 he was Beltz' superior, that Packard in 1937 or 1938 experimented about six months with curved windshields, but not with windshield wipers for wiping them, that from 1938 until after the war Packard had no interest in curved windshields, that there were always written reports of all tests, that he had not seen a blade like D–15 before the war, that there was interest in curved windshields at Packard after the war and that a blade like D–15 had been tested in 1948.

39. Johnson testified that he was in charge of the Packard testing laboratory from 1917 to 1955, that he had never seen or tested a blade like D–15 until after World War II and that there were always written reports of tests.

40. The Court, having observed the witnesses Smith and Johnson, believes their testimony and finds that blades like Exhibit D–15 were not tested at Packard until after 1945. This finding is supported by the circumstantial evidence that reports of tests by Packard on a Zaiger rigid back blade in 1941 were produced but no reports of tests on a blade like D–15 were produced.

41. S. M. Berg testified for defendant by deposition. He said he was a sales engineer for Stewart-Warner, which in 1941 was making windshield wiper motors for Packard, that he told Zaiger and Mixon early in 1941 that Packard wanted a blade for wiping curved glass, that in May or June of 1941 Max Zaiger and Mixon gave him blades identical to D–15, which Vinal Nichols,

the Detroit office handyman, installed on Berg's Packard automobile and which Berg discussed with Gordon Sinclair who, Berg, said, was in charge of the windshield wiper program at the time. He further testified that other blades were sent to John Whitted the project engineer in charge of testing blades for the motors that Stewart-Warner was making for Packard.

42. Whitted, Sinclair and Nichols all testified in open court on behalf of plaintiff. Sinclair stated that he was not employed by Stewart-Warner until July of 1941, that he had nothing to do with the windshield wiper program until 1946 and that he did not remember seeing a blade like D–15 or discussing it with Berg but saw a triple yoke blade for the first time after the war and it was likely that he discussed it with Berg then.

43. Nichols testified that he was an inspector for Stewart-Warner at the Packard plant in 1941 and was not at the Stewart-Warner Detroit office until after the war and had not placed a blade on Mr. Berg's Packard in 1941. He further testified that he had placed blades on cars after the war when he was the handyman at the Detroit office, that he had placed two of plaintiff's blades on Berg's Ford in 1946 and had never seen a blade like D–15 until after the war.

44. Whitted testified that he was the project engineer for Stewart-Warner in 1941 and in charge of testing wipers, that he left Stewart-Warner in 1943, that he did not recall testing a blade like D–15, that he had seen a blade with a rigid back and with spaced pressure application points on Berg's car before the war and that he remembered it because he felt that the application of pressure at spaced points on a rigid back accomplished no useful purpose.

45. The court having observed the witnesses for plaintiff finds that Berg was not given blades like D–15 before the war. This is supported by the evidence that Packard, for whom the blades were allegedly tested, had no interest in 1941 in curved windshields.

46. Defendants failed to produce any evidence that Studebaker, allegedly the company which had inspired the making of D–15, received or made tests of such a blade in 1941.

47. Plaintiff produced in court three witnesses regarding Studebaker, two of these were Wagar and Bowden, former Studebaker employees with whom Zaiger had correspondence in 1941 regarding the Studebaker bent windshield. Bowden testified that he left Studebaker in 1942 and had no recollection of having seen a blade like D–15 before he left.

48. Wagar testified that he did not recall having seen a blade like D–15 in 1941, that he had, at Trico's request, made several searches for evidence of a test of such blade and had found none.

49. The third witness was Edward Larson, plaintiff's executive vice president, who went to Studebaker in 1954 to search for evidence of a test of D–15 in 1941, and testified that the only evidence discovered was a drawer full of old experimental blades dating from prior to 1941 that included a Zaiger rigid back blade but no blade like D–15.

50. The court finds that there is no evidence of Studebaker receiving a blade like D–15 in 1941 or at any time thereafter. Defendants' failure to submit any proof of Studebaker's alleged activities with D–15 is convincing circumstantial evidence that no such blade was given to Studebaker.

51. Rose Lipkus, Max Zaiger's former secretary, testified by deposition that she saw a blade like D–15 in 1941 and that she remembered it because it was "almost revolutionary". She also said that Max Zaiger took but one trip in 1941, that D–15 was kept in a cabinet where Zaiger kept experimental blades, that this cabinet was always locked and Max Zaiger had the only key to it. These statements were all contradictory of Zaiger's testimony that he took several trips in 1941, that the cabinet was never locked and that it did not contain experimental blades.

52. Zaiger and Nesson both testified that no application for patent was filed on D–15 because it was a combination of old elements which they had been advised by counsel was not patentable.

53. In an effort to show that Zaiger and his employees had filed many patents on old combinations, plaintiff in 1957 made a search to get a complete set of such patents and discovered that over a period of about 25 years, 58 such patents had been granted.

54. Although plaintiff did not request a search of patent applications, the search also revealed that Max Zaiger and Nesson in 1948 filed a patent application on a flexible windshield wiper blade that included claims which, according to defendants' argument here, read upon D–15, and which included an oath that the blade covered by the application had not been in public use or on sale more than one year prior to the filing date which was July 30, 1948. The file wrapper of this application is in evidence. It also discloses that in 1950 a claim was added that read not only upon D–15 but on the Zaiger commercial blade of 1948, the plaintiff's blade that was introduced commercially in 1946, and a Trico blade developed in 1947. When the last mentioned claim was added, Max Zaiger asked that the application be placed in interference with an application of plaintiff and a Trico application that were already in interference. The request was denied because of a 1946 publication of plaintiff that showed the blade of the patent in suit. Max Zaiger made no effort to swear back of the 1946 date nor to ask for a public use proceeding holding that the Anderson application was invalid because of the existence in 1941 of D–15. In 1953 Max Zaiger permitted the application to become abandoned. This was after he had agreed with Trico to help it invalidate the patent in suit here which was also asserted in a suit in the United States District Court for the Western District of New York that plaintiff had filed against Trico. [Anderson Co. v. Trico Products Corp., 162 F.Supp. 224.]

55. The testimony here of Max Zaiger and Nesson and defendants' other witnesses about the existence of D–15 in 1941 contradicts the oath of Max Zaiger and Nesson that the subject matter of the 1948 application was not in public use or on sale more than one year before the application was filed.

56. Defendants also introduced the deposition of Frederick O. Wood who testified that he saw a blade like D–15 on Max Zaiger's car in 1941 when he was an attendant at the service station where the car was serviced. The court did not have the opportunity of witnessing this testimony and disregards it because of Max Zaiger's admission that he showed D–15 to Wood before Wood testified and told Wood that the date was 1941. Furthermore at the time concerned in his testimony Mr. Wood was interested in Mr. Zaiger's patronage.

57. Defendants introduced the deposition of Harold Nesson, the brother of Israel Nesson. Harold Nesson testified that in 1941 his brother Israel Nesson put a blade on his car for test purposes. The testimony of Harold Nesson was inadequate to determine the construction of this blade. The Court finds the testimony of Harold Nesson does not prove what, if any, blade was placed on his car in 1941.

58. Defendants also introduced evidence purporting to show that a blade identified as D–10 had been commercially produced by Zaiger in 1940. D–10 had a superstructure similar to D–15 but had a rigid back. Like D–15, D–10 was said to be the only remaining example of such a blade.

59. There was no documentary proof of the existence of D–10. The oral proof was contradictory. Max Zaiger said he sold some blades to the Eastern Massachusetts Street Railway Co. The purchasing agent for that company McGarry denied such a sale but testified that similar blades had been given to him for testing. This testimony regarding D–10 is entitled to little weight and is negativ-

ed by circumstantial evidence regarding D–10. The secondary yokes of D–10 are the same size as the secondary yokes of D–15. If D–10 was in commercial production there would have been no need for Nesson to handmake yokes for D–15 as he testified he did. D–10 was not proved to have been made in 1940.

60. Nesson further testified that he made D–15 in a few weeks but later testified that it took him six months to develop the Zaiger commercial blade of 1947–8. The main difference between D–15 and the Zaiger commercial blade of 1947–8 is the particular backing and the particular lost motion device. These statements of Nesson are not consistent nor believable.

61. Both Nesson and Zaiger knew that D–15 was spurious.

62. Even assuming contrary to the weight of the evidence that D–15 had been made in 1941, no proof was submitted by defendants that D–15 or wipers like it were even in public use or on sale. Max Zaiger admitted that he did not have the equipment to produce wipers like D–15 commercially in 1941 or at any time until 1948, did not have the means to set a price thereon nor had a price thereon been set, had never received an inquiry for sale nor had he offered the wiper for sale. The only claimed uses were tests at Packard, a test by Berg on his car, a test by Zaiger on his car and a test by Nesson on his brother's car. As wipers can be completely tested only on cars, these tests were not public uses but, if made, were abandoned experiments.

63. Exhibit D–15 is a spurious blade not made as testified to by defendants' witnesses and blades like it were not proved to have been in public use or on sale in 1941 or at any other time.

64. The testimony regarding D–15 by defendants' witnesses was unconvincing because it was in part the erroneous testimony of well intentioned disinterested witnesses whose minds were stimulated to memory of something that never existed by Zaiger showing them Exhibit D–15 and in part untrue statements of witnesses closely associated with the defendant Zaiger.

65. The evidence regarding blades like D–15 was all oral testimony about events that allegedly took place many years before. It was proved to be improbable or untrue and is unsupported by any documentary or other evidence except the spurious exhibit itself. The testimony regarding the time and manner of making of D–15 was untrue.

### Conclusions of Law on Issues Raised by Complaint

1. The Court has jurisdiction of the parties and of the subject matter.

2. Claims 6, 8 and 12 of the Anderson patent in suit No. 2,596,063 are good and valid in law.

3. Claims 6, 8 and 12 of the Anderson patent in suit have been infringed by the defendants, by their manufacture and sale of the devices, exemplified by Plaintiff's Exhibits 18, 19, 20 and 21, since the issuance of the patent in suit.

4. Defendants' infringement of the patent in suit has been willful and wanton.

5. The patent in suit was regularly issued by the United States Patent Office. In assailing it, defendants have a heavy burden of proof which they have not sustained. Artmoore Co. v. Dayless Mfg. Co., 7 Cir., 208 F.2d 1.

6. There is an added presumption of validity attaching to the patent in suit as it was involved in a heated contested interference proceeding in the Patent Office which was appealed to the Court of Customs and Patent Appeals and in which the applicant for the patent in suit prevailed, and for the further reason that all of the material prior art patents relied upon here were considered by the Patent Office. Hildreth v. Mastoras, 257 U.S. 27, 42 S.Ct. 20, 66 L.Ed. 112; Artmoore Co. v. Dayless Mfg.

Co., 7 Cir., 208 F.2d 1; Lewyt Corporation v. Health-Mor, Inc., 7 Cir., 181 F.2d 855.

7. Failure for many years on the part of those skilled in the art to produce a windshield wiper for successfully wiping curved windshields confirms the validity of the patent in suit. Its immediate acceptance and extraordinary commercial success further add to the presumption of validity. O'Brien v. O'Brien, 7 Cir., 202 F.2d 254; Ric-Wil Co. v. E. B. Kaiser Co., 7 Cir., 179 F.2d 401.

8. It constitutes no anticipation and no defense to a claim of infringement that one or more elements of a patented combination may be found in one old patent or publication, and others in another, and still others in a third. All of such elements or their mechanical equivalents should be found in the same description or machine where they do substantially the same work by the same means. Imhaeuser v. Buerk, 11 Otto 647, 101 U.S. 647, 25 L.Ed. 945; Lewyt Corporation v. Health-Mor, Inc., 7 Cir., 181 F.2d 855.

9. The imitation of the patented article by all of plaintiff's competitors including defendant Zaiger is conclusive evidence of what the defendants think of the patent and is persuasive of what the rest of the world ought to think. Wahl Clipper Corporation v. Andis Clipper Co., 7 Cir., 66 F.2d 162.

10. The defendants give the prior art the tribute of their praise but they give the patent in suit the tribute of their imitation. Defendants' contention that the prior art devices would serve just as well as the patent in suit is refuted by the fact that they do not use any of these prior art devices, but instead manufacture and sell substantially a Chinese copy of the patented devices. Rubber Tire Case [Diamond Rubber Company of New York v. Consolidated Rubber Tire Company], 220 U.S. 428, 31 S.Ct. 444, 55 L.Ed. 527.

11. Prior art patents are to be measured as anticipations by what is clearly and definitely expressed in them, and they may not be reconstructed in the light of the invention in suit and given a significance and importance which, in fact, they did not have in the art; they may not be reconstructed in the light of later acquired knowledge and then used as part of the prior art; the basic question is what does the cited reference itself say. Texas Co. v. Globe Oil & Refining Co., D.C., 112 F.Supp. 455.

12. The invention of the patent in suit includes elements some of which are new in the art, and the claims are valid because the combination defined in them is new and non-obvious, and by that combination a new and unique mode of operation is provided resulting in an entirely new device. Weller Mfg. Co. v. Wen Products, Inc., 7 Cir., 231 F.2d 795.

13. The patent in suit complies with the requirement of the statute that the invention be disclosed with sufficient particularity so that one skilled in the art may reproduce the invention.

14. The defendants have failed to sustain the burden of proof as to the alleged prior use of wipers like that identified as Exhibit D–15, by any standard that might be applied. They clearly have not proved such use beyond a reasonable doubt as required by law. Barbed Wire Case [Washburn & Moen Mfg. Co. v. Beat 'Em All Barbed-Wire Co.], 143 U.S. 275, 12 S.Ct. 443, 36 L.Ed. 154.

15. Plaintiff is entitled to a judgment, adjudging said patent as valid and infringed, that the plaintiff is entitled to an injunction, that the defendants pay to the plaintiff the amount of damages arising from patent infringement and the costs of this suit, the costs of referring this cause to a master to take an accounting, and reasonable attorneys fees.

### Findings of Fact
### on Issues Raised by Counterclaim

1. The Zaiger Corporation, counterclaimant herein, is a Massachusetts Cor-

poration and has its principal place of business in Lynn, Massachusetts.

2. The Anderson Company, counter-defendant herein, is an Indiana Corporation and has its place of business at Gary, Indiana.

3. The Zaiger Corporation is admittedly the owner of the entire right, title and interest in U. S. Letters Patent No. 2,709,825 of Israel Nesson, filed December 8, 1951 and issued June 7, 1955.

4. The counterclaim patent relates to a connecting structure for joining a windshield wiper blade to the end of a wiper arm which oscillates and carries the blade across the windshield. The connecting structure is commonly called a connector or clip. It is permanently secured to the middle of the back side of the wiper blade, and is sold with the wiper blade. Wiper blades with their connectors are sold for original equipment on automobiles and also for replacement purposes. Only one wiper arm at a time can be used with a connector.

5. In the past thirty years, wiper arm manufactures furnishing the original equipment requirements of automobile manufacturers have provided wiper arms with many different types of terminal ends. Accordingly, the replacement blade manufacturers, who sell through service stations and other retail outlets, provide blades having connector structures which will accommodate the most prevalent of the several types of wiper arm terminal ends currently in use. Such connectors are commonly called "universal" connectors, and the connector structure of the counterclaim patent is in this category. Some such connectors have been formed so that they could directly take the various types of arm ends, and others have been provided with adapter elements which would fit upon the arm end and accommodate it to the particular connector provided.

6. Four of the common types of wiper arm ends which have been in use since 1947 are the spoon, the crossbar, the hook and the slotted terminal, their names being generally descriptive of their structural shape. The spoon arm is provided with a narrow dished end having a terminal lug. Each of the other three arms are channel-shaped to make a close fit with opposite sides of a connector, but each has a different structure for effecting latching with the connector. The crossbar has a round bar joining the opposite channel sides; the hook arm has a U-shaped hook extending forwardly of the channel; and the slotted arm has a slot disposed in the web joining the channel sides.

7. Long before the counterclaim patent was filed in the Patent Office, both The Anderson Company and The Zaiger Corporation had employed "universal" connectors taking these four types of arm ends. The Anderson connector is shown in Exhibit CD–G and was on the market in 1947. The Zaiger connector is shown in Exhibit CD–Y and was admittedly sold commercially in the spring of 1948.

8. The counterclaim patent structure takes the same four types of arm ends previously mentioned. The connector structure has a box-like housing which is secured to the middle of the back portion of the blade. The housing is provided with a number of openings and slots each of which is adapted to receive the terminal end of one of the three types of wiper arms to be accommodated or the adapter for the fourth type. One opening and an adjacent cross-strap on the top of the housing receive the hook-type arm end. Two of the openings are spaced to receive tabs or foot portions of an adapter or hook plate which in turn receives the slotted terminal type of arm end. A leaf spring 42 which is anchored within the confines of the box-like housing, is bent to form three specially shaped spring parts each of which latches a separate arm end to the blade.

9. The connector structure specified in claims 7 through 10 of the counterclaim patent is a classic example of aggregation. Each type of wiper arm end

is attached by a different portion of the connector, and none of the portions mutually cooperate to effect latching or attaching of an arm end. Each portion performs only its well-known function. Three separate parts of the integral leaf spring respectively secure the crossbar arm, the spoon arm or the hook plate to the connector. When one spring part is being used, the other two parts perform no function. The hook arm is attached by merely hooking its end beneath a cross-strap of the connector, and the leaf spring is not used at all. The total performance of the connector is merely a summation of the individual functions of each of the four separate connector portions.

10. Early original equipment connectors for the wiper arm ends taken by the counterclaim structure are shown in Exhibits CD–V, CD–U, CD–W, and CD–R, S, T.

a. The connector of Exhibit CD–V merely has a hook plate secured to the back of a wiper blade and it takes the slotted terminal type of arm end. Such hook plates have been in common use on "multi-purpose" connectors as illustrated in Abdelnour Patent No. 2,539,219 and Anderson Patent No. 2,632,910 of the cited prior art.

b. The connector of Exhibit CD–U has a cross-strap at the top of its housing for receiving a hook-type arm end. This connector was marketed by Anderson before World War II and is further shown in Anderson Patent No. 2,432,693 and Abdelnour Patent No. 2,539,219.

c. The connector of Exhibit CD–W has a pair of opposed slots in the housing for receiving the cross-bar-type arm end, and the connector is provided with a latch member for closing.the open ends of the slots and holding the crossbar in latched position. Anderson utilized this connector structure on aircraft blades during World War II (see Exhibit CD–X), and it is further shown in Smulski Patent No. 2,432,689 and Anderson Patent No. 2,432,693.

d. Finally, the connectors of Exhibits CD–R, S and T all take spoon-type arm ends. The lug of the spoon is merely passed beyond a shoulder in the housing of the connector, and a leaf spring or other resilient means is employed to hold the spoon arm end in latched position. Trico Products Corporation marketed blades with these connectors as early as 1946, and one of the connector structures is illustrated in Rappl et al. Patent 2,-618,805.

11. The Court finds that the counterclaim patent merely incorporates four well-known connecting expedients of the prior art into a single connector housing. Each of the four connecting structures is old in the art; each performs only the same function as when used alone; and each functions in the same manner as earlier, prior art, original equipment connectors. By juxtaposing these connecting expedients in a unitary connector, the counterclaim patentee has achieved nothing new or surprising. Each performs, independently of the others, only its well-known function and nothing more. For these added reasons, the claimed structures of the counterclaim patent are purely aggregative.

12. The only structure of the counterclaim patent not disclosed in the prior art patents is the integral flat leaf spring which is bent in a particular way in three parts to directly effect latching. Each spring part directly contacts and latches a separate arm end or its adapter. Such a spring is an essential element of claims 7 through 10 of the counterclaim patent.

13. None of the prior art patents relied upon by counterdefendants was cited by the Patent Office, and all of the structures of these patents, except one, were proved to have gone into commercial use.

14. The accused Anderson structure is shown in the drawing Exhibit CD–AJ. It includes a hollow housing having a pair of spaced side walls provided with an opposed pair of vertical slots for receiving a crossbar arm end. A bolt mem-

ber is slidably disposed in the housing and normally urged toward latching position by a conventional coil spring in the manner shown in Anderson's Patent 2,-432,689. When in latched position, a finger portion of the bolt is positioned to close the open end of the pair of slots and a forward portion of the bolt restricts an opening near the end of the housing which opening leads to a chamber beneath the bolt where the spoon-type arm end is received. An adapter plate similar to the type illustrated in Anderson Patent 2,632,910 may be retained in the vertical slots by the bolt member to accommodate the slotted terminal arm end, while an aperture and an adjacent metal cross-strap are positioned adjacent the top of the housing to receive the hook-type arm end in the same way as in Anderson Patent 2,432,693. Only the bolt member and the cross-strap of the Anderson connector perform any latching function. The function of the spring is to maintain the bolt in locked position.

15. There was no dispute as to the construction of the prior art, but the expert witnesses for the parties disagreed with respect to the application of the claims of the patent in suit to the structure of the patent and to the accused structures. After having had an opportunity to observe the demeanor of the experts of both parties under interrogation on the stand in open court, the Court finds that much greater weight must be given to the testimony of counterdefendant's expert witness, Mr. Recktenwald, one of counterdefendant's employees with a great deal of experience in the windshield wiper field. His statements were unequivocal, frank and forthright at all times. On the other hand, counterclaimant's expert witness, a patent lawyer hired on a per diem basis, had little personal knowledge of the art in question. He was hesitant and evasive, particularly on cross-examination. He avoided making direct answers to questions on the most obvious structural matters and argued rather than testified while under cross-examination.

16. None of the asserted claims 7 through 10 is infringed by the accused Anderson structures. These claims all call for the aforementioned spring as an essential element. The accused structures have no such spring. They employ a slidable bolt which positively locks the arm ends in position. A conventional coil spring is utilized to slide the bolt toward and maintain it in locked position. This coil spring does not have the particular construction and arrangement necessary to effect the latching specified in each of the claims in suit. Furthermore, there is no direct contact between the spring and the wiper arm ends as in the counterclaim patent structure. Both the construction and operation of the accused devices are different from that of the patent. The spring of the claims is an essential element not found in the Anderson devices.

## Conclusions of Law
### on Issues Raised by Counterclaim

1. This Court had jurisdiction of the parties and of the matter in controversy.

2. Claims 7, 8, 9 and 10 of the patent in suit are invalid because the structure described and claimed is for an aggregation of elements each old in the art and between which there is no cooperation. Richards v. Chase Elevator Co., 1895, 158 U.S. 299, 15 S.Ct. 831, 39 L.Ed. 991; Reckendorfer v. Faber, 1876, 92 U.S. 347, 23 L.Ed. 719.

3. Claims 7, 8, 9 and 10, even if valid, were not infringed by defendants' accused structure. Counterdefendant's accused structures are a further development of its earlier connector structures and lack the essential element, the spring, called for in each of the claims.

4. Counterdefendant is entitled to a judgment adjudging the counterclaim patent to be invalid and not infringed, and dismissing the counterclaim patent with an award of costs to the counterdefendant.